STATE of Missouri, Respondent,

v.

Roy RAMSEY, Jr., Appellant.

No. 73629.

Supreme Court of Missouri,
En Banc.

Oct. 26, 1993.

As Modified on Denial of Rehearing
Oct. 26, 1993.

David S. Durbin, Kansas City, for appellant.

Jeremiah W. (Jay) Nixon, Atty. Gen., Hugh L. Marshall, Asst. Atty. Gen., Jefferson City, for respondent.

HOLSTEIN, Judge.

On November 21, 1988, the bodies of Garnett Ledford, age 65, and his wife, Betty Ledford, age 63, were discovered in the bedroom of their Jackson County, Missouri, home. Garnett Ledford was lying on his back in the bed. He had sustained three gunshot wounds, two of which penetrated the brain. Betty Ledford was seated in a chair beside the bed, her hands tied behind her. She also had sustained three fatal gunshot wounds to the head. Most of the wounds were inflicted at extremely close range. Many valuables belonging to the Ledfords were missing.

Defendant Roy Ramsey was indicted on two counts of first degree murder, § 565.-020,[1] as well as two counts of armed criminal action, burglary in the first degree and felony stealing arising out of the Ledford homicides. The murder counts were tried to a jury resulting in verdicts of guilty and sentences of death. A motion for post-conviction relief was filed, heard and denied. Defendant now appeals the convictions and denial of post-conviction relief.

Defendant's first eight points on appeal, as well as Point XV, assert that defendant's death sentence constitutes cruel and unusual punishment. These points fail to assert wherein and why the trial court erred. In addition, the points include long lists of citations.[2] These points are not in conformity with Rule 30.06(d). Points not properly briefed need not be considered. *Rule 30.20.* Nevertheless, we address the arguments we perceive to be presented in these points.

Points I and II are arguments relating to the proportionality review of defendant's sentence. Point III complains that the statutory aggravating factor of depravity of mind is too vague. Points IV, IX, and X raise claims of improperly admitted evidence. Point V attacks the validity of the prosecutor's discretion to seek the death penalty. Points VI, VII, XXII and XXIII assert improper arguments by the prosecutor. Point VIII asserts that improper victim impact evidence was adduced. Points XI, XII, XVI, XVII and

---

1. All references to statutes are to RSMo 1986 unless specified otherwise.

2. For example, Point I is followed by a list of sixty citations.

XVIII involve allegations of error during the voir dire or jury selection process. Points XIII, XIV and XV assert errors in the giving of jury instructions. Point XIX claims the trial court erred in failing to grant a continuance to allow time to obtain certain sleep disorder tests of defendant, while Point XX claims ineffectiveness of trial counsel in failing to timely request and obtain the same sleep disorder tests. Point XXI contains various claims of error in the post-conviction proceeding relating to ineffective counsel claims.

### FACTS

The primary testimony against defendant in this case came from defendant's brother, Billy Ramsey, and Angela Ray, a girlfriend of Billy. Defendant, Billy and Angela had spent the night prior to November 21, 1988, in the home of defendant's mother, Effie Ramsey, in Kansas City, Missouri. At the direction of Effie Ramsey, Angela had prepared breakfast for the two Ramsey brothers. Following breakfast, defendant retrieved a nickel-plated semiautomatic .22 caliber pistol from his room. Pointing the gun at Angela, he said, "Take me to Grandview." She agreed to do so if defendant would "get the gun out of my face." The three then left the Ramsey home in Angela's vehicle. According to Billy Ramsey, the two brothers had decided to "go out and do some stealing," although Angela was not informed as to why the two wanted to ride to Grandview.

The three left in Angela's 1979 white Ford Fiesta. Having been given directions by Billy, Angela drove to the Ledford house on 102nd Street in Grandview. Angela remained in the car. Defendant and Billy went to the front door. The door was answered by Mr. Ledford. After a brief conversation in which Billy reminded Mr. Ledford that the two had been acquainted earlier through the Ledfords' son-in-law, who had served time in jail with Billy Ramsey, Mr. Ledford opened the glass storm door and came out onto the porch. There Billy and Mr. Ledford continued to talk as the defendant listened.

Apparently tiring of the chatter, defendant pulled the gun and ordered everyone inside. Upon entering, they met Mrs. Ledford. Defendant pointed the gun at her and demanded that she give them money, jewelry, and other valuables. Mr. and Mrs. Ledford were ordered into their bedroom and ordered to open their safe. Mr. Ledford was apparently recovering from back surgery and was using a cane. Because he was unable to bend down to open the safe, Mrs. Ledford had to perform that task. Defendant stayed with the two Ledfords while Billy Ramsey took guns from the hall closet then went to the living room and disconnected the VCR. These items were piled beside the front door. At defendant's direction, Billy obtained a pillow case and took it to the Ledford bedroom. There defendant told Billy he was going to tie up the Ledfords before leaving them. Defendant assured the Ledfords and Billy that he did not intend to harm the couple. Valuables from the safe and bedroom were placed in the pillow case. Billy returned to the living room with the pillow case and was preparing to leave through the front door when he heard "three or more shots." Defendant later explained to Billy that he shot the Ledfords because they knew Billy and could pick defendant out of a photo lineup.

Billy left the house with the stolen property and defendant soon followed. The three then drove back to the Ramsey family home. On the way home, defendant gave Garnett Ledford's wallet to Billy. After removing the money and some other items, defendant threw the wallet, cards and some Ledford family photographs that were in the wallet out the window near 67th Street and Prospect. The wallet and some of the cards and pictures were found that afternoon by two girls walking home from high school. Billy's fingerprints were discovered on some of the items found.

After arriving at the Ramsey house, the Ledfords' possessions were divided among defendant, Billy, and their mother, Effie Ramsey. Among the items taken were cash amounting to approximately $2,500, rings and jewelry, guns and some old silver coins. Billy later pawned rings identified as Mrs. Ledford's. Also, upon learning that defendant had taken more than his share of the loot, Billy took the nickel-plated .22 while defendant slept and sold it.

Only after the crimes did Angela Ray learn of the murders. She became very upset about her connection to the crimes. On Thanksgiving day, defendant, Billy, and Angela were again at the Ramsey house. In front of several members of the Ramsey family, defendant held a knife to Angela's throat and said, "Bitch, if you don't keep your mouth shut, I'm going to kill you." Fearing for her life, Angela fled to Memphis, Tennessee.

Acting on anonymous tips that Angela may have information relating to the Ledford murders, police began searching for her, finding her car at the Ramsey residence. Police later interviewed her. Angela provided the first detailed information implicating defendant and his brother, Billy, in the robbery and murder of the Ledfords. Defendant was taken into custody on November 26 pursuant to warrants issued for his arrest for parking violations. In searching the defendant, a silver coin was recovered, which was later identified as one of those stolen from the Ledfords.

Ballistics examinations determined that the bullets retrieved from the bodies of the Ledfords during autopsies were fired from the nickel-plated .22 caliber semiautomatic pistol that Billy took from defendant. Shell casings recovered from the scene of the crime were fired from the same pistol. Other evidence adduced at trial will be discussed as necessary in addressing the points raised on appeal.

## I.

### (Points I and II)

■ Although not constitutionally required, § 565.035.3 requires this Court to conduct an independent review of a defendant's death sentence. The Court must decide whether the death sentence is excessive or disproportionate to the penalty in other similar cases. In this case, defendant's offenses involved six aggravating factors including: 1) killing for monetary gain; 2) helplessness of victims; 3) multiple murders; and 4) murder of witnesses. Defendant's offenses in this case are similar to other cases where the death penalty was imposed.

*See State v. Hunter,* 840 S.W.2d 850 (Mo. banc 1992); *State v. Ervin,* 835 S.W.2d 905, 927 (Mo. banc 1992); and *State v. Griffin,* 756 S.W.2d 475 (Mo. banc 1988). The facts of this case are remarkably consistent with death sentences affirmed wherein victims were murdered during the course of a robbery. *State v. Murray,* 744 S.W.2d 762 (Mo. banc 1988); *State v. Pollard,* 735 S.W.2d 345 (Mo. banc 1987); *State v. Young,* 701 S.W.2d 429 (Mo. banc 1985). The brutality of entering the home of an elderly couple in the middle of the day, stealing their valuables and inflicting multiple fatal wounds on each to avoid later identification is the kind of intolerable, vicious behavior for which capital punishment is often imposed. Add to this defendant's prior propensity for violent crimes, and it becomes clear the sentence is not disproportionate.

### A.

■ The defendant argues that there were "many mitigating factors" which should be considered. The only ones mentioned are evidence of a sleep disorder, resulting in depression and irritation, and mild mental retardation. The sleep disorder was not shown to impede defendant's ability to understand right from wrong and to behave accordingly. Defendant's intellect was characterized by his own psychologist as being in the "low average range." Low average intellect is not a basis for refusing to impose the death penalty. *State v. Powell,* 798 S.W.2d 709, 713 (Mo. banc 1990). The claims of mitigation cited in the brief as well as others gleaned from the record have been carefully considered. The sentence of death here was not imposed under the influence of passion, prejudice or other arbitrary factors, and there was evidence to support the findings of aggravating circumstances.

### B.

As we understand defendant's second contention, he claims that proportionality review must be reduced to a process of parsing through homicide cases to identify various aggravating and mitigating factors, assigning weight to each of those factors, then mathematically calculating to determine whether

the sentence is proportionate. He argues that anything less than this "objective" process violates the United States constitutional prohibition against cruel and unusual punishment. Defendant apparently misapprehends the purpose of proportionality review.

■ Proportionality review is not constitutionally required. It is designed by the legislature as an additional safeguard against arbitrary and capricious sentencing and to promote the evenhanded, rational and consistent imposition of death sentences. *Pulley v. Harris*, 465 U.S. 37, 47–48, 104 S.Ct. 871, 878–79, 79 L.Ed.2d 29 (1984). Because of the specific and detailed guidance given to trial judges and jurors through statutes and the approved jury instructions, there is substantial consistency in the kinds of murder cases in which the death penalty is imposed before any appellate review occurs. Thus, it is not surprising that in cases where the judgment is affirmed on the law, no new sentencing is required by this Court under the proportionality provisions of the statute. The statutory review merely provides a backstop against the freakish and wanton application of the death penalty. When conducting proportionality review, this Court makes a review of the whole record, independent of the findings and conclusions of the judge and jury. If the case, taken as a whole, is plainly lacking circumstances consistent with those in similar cases in which the death penalty has been imposed, then a resentencing will be ordered. In those rare instances where no prior similar cases exist, this Court will make an independent judgment as to whether the imposition of death is freakish or wanton under the facts of the case. Nothing in the Eighth or Fourteenth Amendments requires this Court to engage in a detailed reweighing of mitigating and aggravating evidence as an aspect of the proportionality review.

Defendant cites a series of cases in which the death penalty was not given, claiming those cases are factually similar to this case. Those cases and others have been examined. None have the aggravating circumstances and the absence of significant mitigating facts that exist here. This claim is denied.

## II.

### (Point III)

■ One of the statutory aggravating circumstances that may justify imposition of the death penalty is that "the murder involved torture or depravity of mind and, as a result thereof, was outrageously or wantonly vile, horrible or inhuman." This aggravating factor was included in the court's instructions. The instruction upon which the finding was made told the jury:

You can make a determination of depravity of mind only if you find:

That the defendant killed Garnett Ledford as a part of defendant's plan to kill more than one person and thereby exhibited a callous disregard for the sanctity of all human life.

Defendant argues that submission of this aggravating circumstance violated his right to be free from cruel and unusual punishment because such circumstance is unconstitutionally vague and fails to properly focus the sentencing decision.

This Court has judicially defined and limited "depravity of mind" to include that the defendant acted with a callous disregard for the sanctity of life, inflicted physical or psychological torture upon his victim, as when the victim has a substantial period of time before death to anticipate and reflect upon death, the brutality of defendant's conduct or nature of the crime involved serious physical abuse, mutilation of the body after death, the absence of any substantive motive, or the absence of remorse. *Sidebottom v. State*, 781 S.W.2d 791, 799 (Mo. banc 1989); *State v. Griffin*, 756 S.W.2d 475 (Mo. banc 1988); and *State v. Preston*, 673 S.W.2d 1, 11 (Mo. banc 1984). Because "depravity of mind" has been narrowly defined judicially, and the jury was given a narrowing instruction in this case, the case is distinguishable from *Godfrey v. Georgia*, 446 U.S. 420, 100 S.Ct. 1759, 64 L.Ed.2d 398 (1980), which held the submission of the aggravating factor, "outrageously or wantonly vile, horrible or inhuman" without further definition, to be excessively vague.

## III.

### (Points IV, IX and X)

### A.

In an effort to discredit Billy Ramsey's testimony, defense counsel focused his cross-examination on the fact that Billy's testimony was the product of a plea bargain under which Billy, if he testified at defendant's trial, would receive a sentence of twenty-five years imprisonment. If Billy reneged on the deal, he would serve sixty-five years. Cross-examination also focused on various inconsistencies between the trial testimony and statements made by Billy at a deposition taken two months before trial, and at the time Billy was arrested. The thrust of the cross-examination was that since Billy's trial answers were inconsistent with certain other prior statements and were given to fulfill a plea bargain with the state to gain favorable treatment, that Billy's testimony at trial was concocted. In response to this cross-examination, the state produced the testimony of Detective Cline, of the Kansas City Police Department, who had interviewed Billy, and the videotaped statement taken of Billy. These statements were apparently made prior to the time that the plea bargain was struck but before the deposition was taken.

■ Prior consistent statements are admissible for the purpose of rehabilitating a witness whose credibility has been attacked by an express or implied claim of recent fabrication of trial testimony. *State v. Richardson,* 349 Mo. 1103, 163 S.W.2d 956, 960 (1942), and *State v. Henderson,* 666 S.W.2d 882, 890 (Mo.App.1984). *See also Fed. R.Evid.* 801(d)(1)(B). Statements consistent with trial testimony given before the corrupting influence to falsify occurred are relevant to rebut a claim of contrivance. *McCormick on Evidence,* § 251, at 119 (4th ed. 1992).

■ Defendant attacks the use of the prior consistent statement as a violation of his right to confront and cross-examine Billy under the state and federal constitutions and as improper bolstering. Here, Billy was available for cross-examination and indeed was subjected to a most vigorous cross-examination. Thus, the claim that he was unable to confront the witness is without merit. Im-

proper bolstering occurs when the out of court statement of a witness is offered solely to be duplicative or corroborative of trial testimony. *State v. Seever,* 733 S.W.2d 438, 441 (Mo. banc 1987). If the prior statement is relevant for purposes other than corroboration and duplication of trial testimony, it is not improper bolstering. Here, the prior consistent statements were relevant to rehabilitate Billy's credibility, which had been attacked during cross-examination.

### B.

Defendant was arrested on November 26, 1988, at his mother's home based on arrest warrants issued on parking tickets. Defendant does not attack the validity of those warrants. His complaint is that the search incident to the arrest was invalid because the arrest was pretextual. The search resulted in discovery of a silver Chinese coin in defendant's pocket. The coin was like those collected by Mr. Ledford.

■ Evidence obtained as a result of a pretextual arrest is inadmissible as violative of the Fourth Amendment. *State v. Dulany,* 781 S.W.2d 52, 57 (Mo. banc 1989). In determining whether an arrest is pretextual, the question is whether the arresting officer's conduct, assessed objectively, meets the standards of the Fourth Amendment. So long as police do no more than they are legally permitted to do, the officer's motives in making the arrest are irrelevant. *State v. Mease,* 842 S.W.2d 98, 105–06 (Mo. banc 1992). Here the arrest was authorized pursuant to a valid arrest warrant. It was not pretextual.

■ Defendant also argues that the officers should not have come into his mother's house to search for him without a search warrant. The record reflects that when police knocked, an adult named Mrs. Roper opened the door. When asked if the defendant was in the home, Mrs. Roper nodded her head in the affirmative, then pointed in the direction of defendant. Mrs. Roper's voluntary opening of the door so that defendant could be seen and her identification of the defendant were justification to enter to make the arrest. Under the Fourth Amendment, an arrest warrant based on probable

cause implicitly carries with it the limited authority to enter a dwelling where the suspect lives when there is reason to believe the suspect is within. *Payton v. New York,* 445 U.S. 573, 603, 100 S.Ct. 1371, 1388, 63 L.Ed.2d 639 (1980). There was no search of the Ramsey home. The officers were entitled to conduct a search of defendant's person and the area within his immediate control incident to that arrest. *See State v. Giffin,* 640 S.W.2d 128, 132 (Mo.1982), and *State v. Bailey,* 839 S.W.2d 657, 660 (Mo. App.1992).

### C.

Defendant further objects to testimony of Detective Cline relating to statements made by defendant after being arrested. On arriving at the jail, Detective Cline gave defendant a written Miranda[3] waiver form. Defendant then read the form aloud and assured Detective Cline that he understood it. Defendant then told the police officer that he traded $5.00 worth of dope to a white boy for the coin. Further investigation failed to verify defendant's story.

 Where a defendant's waiver of rights was done knowingly, voluntarily and intelligently considering the totality of the circumstances, statements made by a defendant are admissible. *State v. Powell,* 798 S.W.2d 709, 713 (Mo. banc 1990). The trial court's finding in this regard was not clearly erroneous, and admission of defendant's statements was not error.

### IV.

### (Point V)

 Defendant challenges the Missouri death penalty statute as vesting too much discretion in the prosecutor in determining whether to seek the death penalty, in violation of the Sixth, Eighth and Fourteenth Amendments of the United States Constitution, and article I, § 21 of the Missouri Constitution. He asserts that this discretion results in arbitrary and capricious death sentences pursuant to *Furman v. Georgia,* 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1982). Discretionary acts before the sen-

tencing phase are irrelevant to whether the death penalty was arbitrary and capricious. "Only acts that concern punishment and that occur after conviction for capital murder are relevant on the issue." *State v. McMillin,* 783 S.W.2d 82, 101–02 (Mo. banc 1990). A discretionary decision by a prosecutor to afford an individual defendant mercy does not invalidate the constitutionality of the death penalty. *Gregg v. Georgia,* 428 U.S. 153, 199, 96 S.Ct. 2909, 2937, 49 L.Ed.2d 859 (1976).

### V.

### (Points VI, VII, XXII and XXIII)

 Defendant makes a series of arguments complaining that the prosecutor's closing arguments in the guilt and punishment phases as well as opening statement in the punishment phase violated his constitutional rights because of their inflammatory nature. As a general statement, prosecutors' arguments which do not manipulate or misstate the evidence and which do not implicate specific rights, such as the right to counsel or to remain silent, are constitutionally permissible. *Darden v. Wainwright,* 477 U.S. 168, 181–182, 106 S.Ct. 2464, 2471–72, 91 L.Ed.2d 144 (1986). The specific comments complained about include the following:

### A.

 The state referred to the defendant during the guilt phase argument as Roy "Rambo" Ramsey after one of the witnesses testified that was the name Ramsey usually used. Because reference was consistent with the testimony given during the trial, the argument was not error.

 The prosecutor also argued that the evidence of guilt was uncontradicted. The defendant now claims that this violated his Fifth Amendment right not to testify. Stating that the evidence is uncontradicted is not a "direct and certain reference" to a defendant's failure to testify and, thus, is not error. *State v. Lee,* 841 S.W.2d 648, 653 (Mo. banc 1992).

---

**3.** *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

During the closing argument in the guilt phase, the prosecutor prefaced certain comments with the words, "I can't believe that reasonable people . . .", and "We know . . ." In addition, the prosecutor referred to the manner in which Betty Ledford was found and asked the jurors to "try to sit like that." Objections were made to these comments. The objections were sustained and the jury was instructed to disregard the comments. However, the trial court overruled motions for mistrial on this basis. "The declaration of a mistrial is a drastic remedy to be granted only with extreme caution and in extraordinary circumstances." *State v. Feltrop*, 803 S.W.2d 1, 9 (Mo.App.1991). In this case, the sustaining of the objection and instructions to the jury were ample to assuage any possible prejudice.

The state argued that Mr. Ledford watched his wife be tied up, knew he was going to be executed, decided to fight, and that Mrs. Ledford watched as blood ran down her husband's face. An objection was entered by the defendant that those facts were not in evidence. The court noted the ballistic evidence and overruled the objection. "In closing argument, a prosecutor may state conclusions that can be legitimately drawn from the evidence so long as there is no implication of the possession of secret knowledge by the prosecutor." *State v. Debler*, 856 S.W.2d 641, 651 (Mo. banc 1993). Mrs. Ledford was found with her hands tied behind her back in a chair, Mr. Ledford was found unrestrained, lying on his back in the bed with wounds indicating that he had attempted to resist by raising his arm, and at least one of the wounds entered Mr. Ledford's face. This evidence, together with testimony of the medical examiner, crime scene investigator and the ballistic expert, permit a legitimate inference that the homicides occurred as hypothesized by the prosecutor.

During defense counsel's portion of the argument during the guilt phase, he suggested that Angela Ray had a conviction for stealing even though she denied such conviction on the stand and the prosecutor presented evidence that she had no convictions. The prosecutor, over the defendant's objection, then argued that what defense counsel "didn't tell you is Angela Ray didn't have any convictions. He wants you to believe that she was hiding something and he knows that not to be true." Defendant claims now that a mistrial should have been granted because the argument was a direct attack on counsel's credibility to the prejudice of the defendant. The state's argument was merely an explanation regarding Angela Ray's criminal history, provoked by the defense argument. Considerably more leeway is permitted when the argument is retaliatory. *State v. Walls*, 744 S.W.2d 791, 797 (Mo. banc 1988). The argument was permissible.

Defense counsel also objected to the prosecutor's argument, "If ten of you believe that he [the defendant] acted alone, and two of you think that he aided, he's guilty of murder in the first degree." The prosecutor correctly stated the law. *§§ 565.020, 562.036*, and *562.041; State v. Six*, 805 S.W.2d 159, 165 (Mo. banc 1991).

The defendant argues the state should not have been permitted to argue that there "was a reason" Angela Ray's address was not brought out during examination. The remark was supported by the evidence. At trial, evidence was adduced that the defendant had threatened Angela's life, causing her to flee to Memphis, and that she continued to be fearful for her well-being. In addition, when the prosecutor made the remark complained of, an objection was sustained and the jury was directed to disregard it. The admonition was adequate.

Defendant complains that the state characterized its burden of proof as merely beyond a reasonable doubt. The objection was sustained and the jury was again instructed to disregard the word "merely." Trial courts have wide discretion in controlling the scope of argument. *State v. Lee*, 841 S.W.2d 648, 653 (Mo. banc 1992). In this case, the guilt phase closing argument by the prosecutor did not amount to error, plain or otherwise.

## B.

Defendant objects to a number of comments made during the closing argument

of the penalty phase. He complains that the prosecutor's arguments were the prosecutor's opinions, misstatements of the evidence, and had the effect of distorting the jury's role in the sentencing process. The specific statements complained of include the following:

> [O]ur job is to hold Roy Ramsey accountable based on the evidence and the reasonable inferences and the instruction of the law.
>
> . . . .
>
> There are three reasons why we have the death penalty. The first is that it is, by definition, a just punishment for those very rare, very rare people that commit this type of crime ... it's a just punishment legally and morally.
>
> . . . .
>
> Second, it's a deterrent, and we can engage in speculation as to the value of that deterrence on others, but we know with certainty the death penalty deters Roy Ramsey.
>
> . . . .
>
> The third reason is retribution.

Reading the above comments in context, they are not, as characterized by the defendant's brief, personal opinions, misstatements of evidence, or a distortion of the jury's role. Comments on the justifications for the death penalty, *i.e.*, retribution, incapacitation and deterrence, are permissible. *Coleman v. Brown*, 802 F.2d 1227, 1239 (10th Cir.1986). Arguing that the facts in this case justify the death penalty for any or all of the reasons stated by the prosecutor is not improper argument.

■ Later, during the prosecuting attorney's rebuttal argument during the penalty phase, he stated:

> I wonder, as Garnett and Betty were in their room, if they were praying.

The comment was retaliatory argument in response to a defense attempt to obtain mercy by relying on religious principles of the Old and New Testament scripture, noting that retribution and revenge are not part of either the Bible or the law. More leeway is granted in retaliatory arguments than might be permissible otherwise. The comments

must be so offensive as to deprive defendant of a fundamentally fair trial. *Darden*, 477 U.S. at 179–80, 106 S.Ct. at 2470–71. The trial court did not abuse its discretion in allowing the state to make such retaliatory argument. *See State v. Mease*, 842 S.W.2d 98, 109 (Mo. banc 1992).

■ The final portion of the state's argument during the punishment phase to which defendant objects was a statement by the prosecutor,

> We can't protect people in our society from Roy Ramsey. If they are in [jail] on a traffic ticket or a forgery or a credit card fraud or a misdemeanor possession, they're in jail with the horror that is Roy Ramsey. The usual argument against the death penalty is, "Let's put them in jail where they can't hurt anyone." The members of this jury do not have that option with Roy Ramsey. We can't say that.

Thereafter, an objection was made. The court overruled the objection but admonished the jury that the prosecutor is "not arguing the law in the respect that there are no options." Taken in context, the prosecutor's argument was in retaliation for an argument by the defense counsel that defendant could be deterred by being in the penitentiary so that "he'll never do anything again." The argument was not improper, particularly in light of the trial court's admonition and defendant's history of violent crime. Defendant relies on *Newlon v. Armontrout*, 885 F.2d 1328 (8th Cir.1989), as authority for his claim that the prosecutor's arguments were improper personal references. In that case, the prosecutor made improper and misleading statements which were not the subject of curative instructions by the court. In particular was the following statement by the prosecutor, "I never saw a man who deserved it [the death penalty] more ..." No argument was made in this case that would fatally infect the penalty phase so that it could be characterized as fundamentally unfair.

### C.

Defendant also argues that there was error in the state's opening statement during the punishment phase. Among other criminal convictions which the state indicated it

was going to prove was that on October 25, 1976, defendant committed the crime of sodomy against another inmate while awaiting trial on an armed robbery charge. Defendant claims the statement that the victim was "another inmate" was not supported by evidence and was made in bad faith.

■ The state offered four exhibits, exhibits 84 through 87, setting forth the defendant's convictions and a certified copy of the Missouri Department of Corrections record of his prison sentences, the time of his discharge, and whether he was paroled. These exhibits are not included in the record on appeal. We are unable to say whether those exhibits would show that defendant was or was not incarcerated on October 25, 1976. An appellant usually receives no favorable presumptions from the failure to include such exhibits in the record on appeal. *Wykle v. Colombo,* 457 S.W.2d 695, 700 (Mo.1970); *Kennedy v. State,* 771 S.W.2d 852, 854 (Mo. App.1989); *Rule 30.05.*

■ It is unclear whether the prosecutor was reading from an exhibit or merely commenting on an exhibit, however, the following was presented as evidence before the jury:

> The penpac, the transcript of serial record [Exhibit 87], shows that in relation to the robbery first degree case committed on September 28, 1970, this defendant was discharged, released from the Missouri Department of Corrections on July 2, 1976. You know that on August 29, 1976, he committed another robbery, for that was sentenced but while awaiting trial on October 25, 1976, he committed the sodomy.

This statement was made without objection from defense counsel. Defense counsel does not now suggest that defendant was not in jail on October 25, 1976. Certainly, it is at least inferable that if defendant committed sodomy on October 25, 1976, while awaiting trial for first degree robbery, that the victim was a fellow inmate. The prosecutor's statements appear to be made in good faith. *State v. Brooks,* 618 S.W.2d 22, 24 (Mo. banc 1981); *State v. Rios,* 840 S.W.2d 284, 287 (Mo.App.1992). There was no error in allowing these statements.

### D.

■ Similar complaint is made regarding a question asked of Dr. Glenn Lipson, the defendant's psychologist who testified in the punishment phase. Dr. Lipson had testified that defendant would adapt well to incarceration. On cross-examination, the prosecutor asked if that opinion would change if the doctor knew defendant had "sodomized a man in prison." Experts may be cross-examined to test the credibility, validity and weight of their opinion by being asked whether different facts would alter that opinion. *State v. Goree,* 762 S.W.2d 20, 23 (Mo. banc 1988). Here defense counsel interposed an objection. However, there was no objection that the prosecutor acted in bad faith by stating that defendant's victim was an inmate. Review is limited to plain error. Absent something in the record to indicate bad faith by the prosecutor in suggesting that the defendant had sodomized a fellow inmate, there is no manifest injustice or miscarriage of justice.

### VI.

### (Point VIII)

■ Defendant complains that there was improper victim impact evidence offered. The evidence referred to is a photograph of the victims' living room, where a VCR had been stolen, showing items on top of the VCR were knocked off. In the picture are personal items, including dolls and stuffed animals. Another exhibit was a photograph showing the Ledfords' bedroom. In it several boxes appeared to have been ransacked. On nearby tables were photographs of children and the Ledfords' bed. The exhibits were relevant to establish stealing as a motive for the murders. The other evidence claimed to be improper victim impact evidence were photographs and cards from Mr. Ledford's wallet found by the two schoolgirls. The information from the cards that was presented to the jury was that the witness answered affirmatively when asked if Mr. Ledford's name was on each of the cards. Later testimony disclosed that Billy Ramsey's fingerprint was on one of the cards. These cards and pictures were apparently not shown to the jury.

To support his claim that this was improper victim impact evidence, defendant relies on *Booth v. Maryland*, 482 U.S. 496, 107 S.Ct. 2529, 96 L.Ed.2d 440 (1987). Just over three years later, *Booth* was overruled by *Payne v. Tennessee*, —— U.S. ——, 111 S.Ct. 2597, 115 L.Ed.2d 720 (1991). Nevertheless, defendant argues that since he was tried and sentenced while *Booth* was "good law," he was entitled to its benefit at the sentencing hearing.

Assuming, without deciding, that defendant was entitled to the benefit of *Booth,* the question is whether the evidence in this case was improper victim impact evidence. In *Booth,* a victim impact statement was presented to the jury at the sentencing phase of the trial. The victim impact statement described personal characteristics of the victim, the emotional impact of the murder on the family, and the family members' opinions and characterizations of the crimes and the defendant. The court concluded that these factors were wholly unrelated to the blameworthiness of the defendant and served no purpose other than to inflame the jury and divert it from deciding the case on evidence relevant to the crime and the defendant. 482 U.S. at 508, 107 S.Ct. at 2536.

*Booth* is distinguishable from the case now before the Court because here the photographs were offered during the guilt phase to show that items were knocked off the VCR when it was stolen and that the bedroom had been ransacked. The crime scene photographs were clearly relevant on the question of the motive for the crimes. The fact that dolls, stuffed animals and family photographs were in those rooms at the time the crimes were committed does not transform otherwise relevant evidence into victim impact evidence. In addition, these items appearing in the background of the photographs do not communicate a message of emotional distress on the victims' family or emotionally charged opinions by family members, as was the case in *Booth.*

Defendant also relies on *South Carolina v. Gathers*, 490 U.S. 805, 109 S.Ct. 2207, 104 L.Ed.2d 876 (1989), as a basis for objecting to the cards and photographs found by the schoolgirls and later identified as belonging to Mr. Ledford. These were never passed to the jury, as were personal papers found around the victim's body in *Gathers*. Thus, the content of the documents cannot be said to have inflamed the jury. Their relevancy was clearly to provide a link between the cards, which belonged to the victim, Billy Ramsey's fingerprint found on the card, and the defendant's participation in the crime.

In any event, both *Booth* and *Gathers* have been overruled. None of the cases cited by the defendant hold that *Booth* and *Gathers* must apply to cases tried prior to the decision in *Payne*. As the court in *Payne* pointed out, *Booth* unfairly weighted the scales in a capital trial by forbidding the state from offering a glimpse into the life which a defendant chose to extinguish. The court returned to the equilibrium espoused by Justice Cardozo in *Snyder v. Massachusetts*, 291 U.S. 97, 122, 54 S.Ct. 330, 338, 78 L.Ed. 674 (1934), when he said, "[J]ustice, though due the accused, is due the accuser also. The concept of fairness must not be strained till it is narrowed to a filament. We are to keep the balance true." The defendant's argument on this point fails.

## VII.

### (Points XI, XII, XVI, XVII and XVIII)

Defendant makes several challenges related to the voir dire and jury selection.

### A.

Defendant complains that the state struck a black venireperson, Sheila Braswell, because of her race, in violation of the prohibition in *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), against the use of the peremptory challenge of jurors solely on the basis of race.

The prosecutor's reason for challenging Ms. Braswell was that she had applied for a law enforcement position with the county and had been turned down. Where a prosecutor gives a reasonably specific race-neutral reason, the prosecutor's explanation will suffice unless there is an inherently discriminatory intent in the explanation. *Hernandez v. New York*, —— U.S. ——, ——

——, 111 S.Ct. 1859, 1871–72, 114 L.Ed.2d 395 (1991). The trial court's determination of the *Batson* issue will be set aside only if the appellate court is left with the firm and definite belief that a mistake has been made. *State v. Blankenship,* 830 S.W.2d 1, 15 (Mo. banc 1992). In this case, the prosecutor's explanation was specific, racially neutral, and free of any racially discriminatory purpose. The *Batson* claim fails.

### B.

▆▆▆ Defendant submitted eleven proposed penalty phase voir dire questions which were requested to be read by the trial judge. The general thrust of the questions was to develop the jurors' views regarding the death penalty. In addition, the questions contained what was clearly intended to be an instruction of law that the jury is "never required to impose" the death penalty.

After a lengthy discussion, the court agreed to and did ask the following questions, which were two of the questions proposed, with modifications:

> You are going to be instructed on aggravating and mitigating circumstances. Aggravating circumstances are reasons for you to consider the death penalty as an appropriate punishment. Mitigating circumstances are reasons for you to consider life without parole as an appropriate punishment.

> My first question to you is, if you were selected as a juror? Would you be able to vote for both of the punishments authorized by law? Would you be capable of voting for a death sentence, would you be capable of voting for a sentence of life without parole?

A follow-up question was asked by the trial judge, "Would you have a tendency to favor either the death penalty or the life imprisonment penalty, or neither?" In addition, all the jurors were asked if they would be able to consider the evidence and follow the law as instructed by the court.

These questions were sufficient to determine whether the venirepersons had disqualifying scruples favorable to or against the death penalty. *See Wainwright v. Witt,* 469

U.S. 412, 423, 105 S.Ct. 844, 851, 83 L.Ed.2d 841 (1985), and *Witherspoon v. Illinois,* 391 U.S. 510, 517–19, 88 S.Ct. 1770, 1774–76, 20 L.Ed.2d 776 (1968). In addition, these questions were sufficient to inform the defendant of any nondisqualifying tendencies of jurors regarding the death penalty so that he could intelligently exercise peremptory challenges. Also noteworthy is the fact that the defendant was not prevented from asking follow-up questions of those jurors who professed a tendency favorable to or against the death penalty.

▆▆▆ Control of voir dire is within the trial court's discretion and will not be disturbed absent abuse. *State v. Oxford,* 791 S.W.2d 396, 399 (Mo. banc 1990). An abuse of discretion combined with likely injury to the defendant would warrant setting aside a conviction. *State v. Bannister,* 680 S.W.2d 141, 145 (Mo. banc 1984). Here there was no abuse of discretion in the trial court's refusal to ask questions which, for the most part, were merely redundant and prolix versions of what was asked by the trial court.

### C.

▆▆▆ Defendant argues that the prosecutor was improperly permitted to inquire on voir dire regarding felony murder, accomplice liability, plea bargaining and circumstantial evidence. Specifically, the prosecutor explained he wanted to know if members of the panel had difficulty with the felony murder concept or the concept of accomplice liability, because he planned to submit an instruction regarding the defendant's accomplice liability for burglary. The prosecutor was also interested in determining if there were jurors who would automatically disbelieve a witness who entered a plea agreement. Finally, since there were no eyewitnesses to this murder, the state asked if anyone in the panel would have a problem basing a decision on circumstantial evidence.

The control of voir dire is a matter of trial court discretion, which will not be disturbed absent an abuse of discretion. *Bannister.* Ordinarily, counsel should not be permitted to ask members of a venire to make commitments regarding how they will decide particular issues. However, the trial court may

permit parties to inquire whether potential jurors have preconceived notions on the law which will impede their ability to follow instructions on issues which will arise in the case. *State v. Dixon,* 717 S.W.2d 847, 848 (Mo. banc 1986). Here we find no clear abuse of discretion or real probability of injury to defendant.

### D.

The defendant claims that thirteen members of the venire were dismissed improperly for cause due to death penalty scruples when, in fact, such venirepersons had no disqualifying death penalty scruples. A brief discussion of the answers given by the venirepersons demonstrates the inaccuracy of the contention.

Venireperson Cooper was excused for cause not because of death penalty scruples, but because his brother was hospitalized and the two had been in close contact regarding the brother's illness. Venireperson Dale was excused because she had the flu and was very ill. While equivocating somewhat, venireperson Owen ultimately stated he could not "feature ... imposing the death penalty." Venireperson Waitley answered affirmatively when asked if her view of the death penalty would impair her performance of her duty as a juror to impose a punishment in accordance with the law, her oath and her conscience. The following venirepersons indicated they could not, under any circumstance, give the death penalty: Voyles, Tinoco, Jackson, Bacon, Sullivan, Brown, Harris and Cooper. Venireperson Bradshaw indicated he was unable to vote for life without parole or a death sentence. There was no error in excusing any of these venirepersons for cause.

### E.

Defendant claims the trial court erred in overruling his challenges for cause against members of the venire who he felt leaned toward the death penalty. Venireperson Atwood said he was capable of voting for the death sentence or life imprisonment, although he "leaned toward the death penalty." Venireperson Dillon said she could vote for life imprisonment or the death penalty, although she would have a tendency to lean toward the death penalty.

The standard for determining whether a juror should be excused for cause is whether his or her views would "prevent or substantially impair" the performance of duties as a juror. *State v. McMillin,* 783 S.W.2d 82, 91 (Mo. banc 1990). The trial judge who actually sees and hears the potential jurors is accorded deference in determining whether such persons should be dismissed for cause. The trial court did not err in overruling defendant's motions to dismiss jurors for cause.

### VIII.

### (Points XIII, XIV and XV)

Defendant makes several complaints regarding the giving of the instructions.

### A.

Defendant argues the trial court should not have used MAI–CR3d 300.02, 302.04, and 313.30 because each of these instructions includes the words "firmly convinced" in defining proof beyond a reasonable doubt. The phrase has been repeatedly upheld. *See State v. Twenter,* 818 S.W.2d 628, 634 (Mo. banc 1991), and *State v. Blankenship,* 830 S.W.2d 1, 12–13 (Mo. banc 1992), and cases therein cited. The point is denied.

### B.

Defendant also contends the trial court erred in instructing the jury with MAI–CR3d 313.40 through 313.48 because, he claims, the instructions limit consideration of mitigating circumstances and imply the jury must find mitigating circumstances unanimously. MAI–CR3d 313.44 was given. The instruction given provided in part:

It is not necessary that all jurors agree on the existence of the same mitigating circumstance. If each juror finds one or more mitigating circumstance suggicient [sic] to outweigh the aggravating circumstances found to exist, then, on Count I/II, you must return a verdict fixing defendant's punishment at imprisonment [for]

life by the Department of Corrections without eligibility of probation or parole. Thus, the claim that the instruction directs that all jurors find the *same* mitigating circumstances is refuted by the plain language of the instruction.

In the argument portion of the brief on this point, a separate argument is raised. The argument is based on the language in *Lockett v. Ohio*, 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978), and *Jurek v. Texas*, 428 U.S. 262, 96 S.Ct. 2950, 49 L.Ed.2d 929 (1976), requiring that the sentencer in all capital cases must be permitted to give weight to mitigating factors, to be consistent with the Eighth and Fourteenth Amendments. Defendant complains that the instructions require that the jury consider whether those aggravating circumstances justify the death penalty without concurrently considering mitigating circumstances.

■ Under our two-step instructional scheme, the jury must first make a unanimous finding that aggravating factors exist justifying the death penalty. Then and only then is there a need to consider the mitigating factors. Under this scheme, the jury must consider both aggravating and mitigating factors before returning a death sentence verdict. Because the jury must consider both aggravating and mitigating circumstances before returning a verdict imposing the death penalty, our instructions are consistent with the mandate of *Lockett* and *Jurek.*

## C.

■ Defendant complains that the trial court improperly submitted instructions[4] repeating the same aggravating circumstance. Section 565.032.2 lists the statutory aggravating circumstances. The first of the listed circumstances is that the offense was committed by one who has one or more serious assaultive criminal convictions. The first aggravating circumstance listed in each of the two punishment phase instructions on the subject is that defendant was convicted of first degree robbery on January 19, 1971. The second aggravating circumstance submitted is that defendant was convicted of sodomy on January 20, 1977. The third aggravating circumstance is that defendant was convicted of first degree robbery on February 16, 1977. The jury found all three aggravating circumstances.

The same issue presented here was addressed in *State v. Clemmons*, 753 S.W.2d 901 (Mo. banc 1988), *cert. denied*, 488 U.S. 948, 109 S.Ct. 380, 102 L.Ed.2d 369. The defendant claimed that allowing the jury to consider a prior murder and prior first degree assault conviction as two separate aggravating circumstances was error, notwithstanding that the approved instructions mandate prior convictions be separately submitted. The Court there held that the procedure under the approved instructions does not add any aggravating circumstances to those listed in the statute. 753 S.W.2d at 911–912. In addition, the structure of our death penalty statute implicitly requires each statutory aggravating circumstance be submitted separately because once a jury finds one aggravating circumstance, it may impose the death penalty. Separation of such prior convictions permits the jury to consider the death sentence if any one of several convictions is found to exist. *State v. Shaw*, 636 S.W.2d 667 (Mo. banc 1982). By separating the prior convictions, any potential jury confusion is eliminated. Instructions accurately submitting the law do not violate the Eighth Amendment.

## IX.

### (Points XIX and XX)

On February 2, 1990, defense counsel filed a motion to transport defendant to a facility for a neurological examination and an electroencephalogram. Both motions were sustained on February 5, 1990, and an order was issued allowing defendant to be transferred to the neurological department of the Truman Medical Center on February 9, 1990. Defense counsel filed a motion on February 6, 1990, to transport defendant to the sleep disorder center of Research Medical Center. How this motion was ruled is not clear from the record. In defense counsel's testimony

---

4. The instructions complained of are not set out in the brief, as required by Rule 30.06(e).

at the post-conviction hearing, he stated that he had arranged a full sleep disorder study and sent the results to appropriate professionals.

About a month before trial, defense counsel was told the results were inconclusive because the tests were not done properly and must be redone. On November 21, 1990, defense counsel moved to transport defendant to Research Medical Center for a multiple sleep latency test and a polysomogram. This motion was sustained on November 26, 1990, and an order was issued permitting defendant to be transported and tested at Research Medical Center.

Although tests were scheduled for November 29, 1990, the hospital advised defense counsel on November 27 that the tests would not be allowed because defendant posed a security risk. Because of this, defense counsel moved for a continuance and that defendant be transported to Menninger Clinic in Kansas to take another sleep test. The motion stated testing could not begin until December 3, 1990, the same week during which trial was scheduled to begin. The court granted the motion for testing but conducted a hearing on December 3 regarding the continuance. At the hearing, defense counsel stated defendant could not be transported to Kansas because the sheriff would have no jurisdiction in Kansas. The court acknowledged it had no control over the red tape required of defense counsel to obtain the test. The trial judge also cited his lack of authority over private hospital restrictions and the court's lack of jurisdiction in Kansas, noting, "We made the best effort we could to get the last minute problem resolved." The court considered the age and preparation of the case, over two years old by then, and overruled the motion for continuance. Defendant raises two issues related to the events surrounding the sleep disorder studies.

### A.

■ Defendant argues the trial court erred when it overruled defense counsel's motion for continuance made on November 29, 1990, because such tests were necessary on the issue of culpability for sentencing.

The purpose of the test results was to provide mitigating information, not to show defendant suffered from a mental disease or defect that would negate criminal *mens rea.* The court granted approval of the requested procedures nine months before trial. The decision to deny the last minute continuance was within the sound discretion of the trial court, and a strong showing is necessary to prove abuse. *State v. Schaal,* 806 S.W.2d 659, 666 (Mo. banc 1991). Considering the amount of time allowed to obtain the tests and defense counsel's concerted efforts, the absence of accessibility to the facility where the tests were requested, the age of the case and the inconclusiveness as to what the results would prove, the trial court's decision was not an abuse of discretion.

### B.

■ Defendant argues that he was denied effective assistance of counsel because counsel did not timely file a request to obtain the sleep disorder tests. Referring to the facts stated above, it is apparent counsel filed requests with the court in ample time to obtain the tests. The problem was not one of counsel's ineffectiveness but of difficulty in locating suitable testing facilities. One sleep test had already been performed in the jail.

■ To prove ineffective assistance of counsel, defendant must show his attorney's performance did not conform to the degree of skill, care and diligence required of a reasonably competent attorney, and defendant was thereby prejudiced. *Strickland v. Washington,* 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984). The record shows defense counsel's efforts to obtain further testing for mitigation purposes were diligent. In addition, no evidence was offered of any sleep disorder study at the post-conviction hearing. The results of such study are, at best, speculative. To demonstrate ineffectiveness of counsel in failing to investigate or present evidence, a movant is required to show what the evidence would have been. *State v. Twenter,* 818 S.W.2d 628, 636 (Mo. banc 1991). Absent such evidence, prejudice is not demonstrated.

## X.

### (Point XXI)

Defendant contests the finding of the post-conviction relief court that he was denied effective assistance of counsel on several other grounds. The first involved counsel's failure to impeach Billy Ramsey with letters allegedly written to the defendant. Defendant claims he received three letters wherein Billy apologized for testifying falsely against defendant. Defendant mentioned the letters to defense counsel sometime after Billy's deposition, and counsel asked to see the letters. Defendant claimed he gave the letters to defense counsel before the trial started but also said he received the third letter right after Billy was called to testify. Defendant later stated he gave counsel only the first two letters before trial. Billy was not called at the post-conviction hearing to verify or deny that he authored the letters.

In contrast, defense counsel remembered being presented only two letters and testified he did not receive them until the last morning of the guilt phase, on the eighth day after trial had commenced. The motion court found defendant did not show the letters to defense counsel until the last day of the guilt phase when he also showed them to jail guards. That finding is supported by the evidence.

Counsel testified at the post-conviction hearing that since he was given the letters at the end of the trial, he had a difficult time believing they were true. Having just received the letters on the last day of the guilt phase, he did not have adequate time to authenticate the letters without tipping off the prosecutor. Counsel testified he considered recalling Billy to confront him, but the defense team decided it would be safer not to do so, believing that, at best, Billy would admit writing the letters only because he feared retribution from defendant. Because of information received from an alternate juror who had been discharged by that point, defense counsel believed he had a good chance for a second degree murder verdict and did not want to risk pursuing the letters because it might appear defendant had either created the letters himself or forced Billy to write them. If the letters were false or written under duress, the prosecutor would have more ammunition to use against defendant.

■ Defendant relies on *State v. Wells*, 804 S.W.2d 746 (Mo. banc 1991), where this Court affirmed the motion court's finding of ineffective assistance of counsel. In that case, a letter to defendant exonerating him of murder was given to the public defender long before trial. Later, the public defender did not attempt to find the letter because she believed it did not exist. The defendant regained possession of the letter only after the trial was over. In *Wells* the omission of the letters was not a part of trial strategy. *Id.* at 748. In contrast, the defendant in this case had the letters all along. The only way defense counsel could obtain the letters was through defendant. Counsel cannot be faulted for defendant's failure to give the letters to counsel until late in the case. The motion court found, and the record supports the conclusion, that by the time counsel was given the letters, counsel's decision not to pursue the letters was a matter of sound trial strategy.

■ Defendant further claims counsel was ineffective by failing to call four witnesses: Don Macy, Pam Crane, Dr. William S. Logan, a psychiatrist, and Jill Miller.

Macy and Crane observed Angela's car at the Ledford house. Although Macy had been unable to pick defendant out in a police lineup, defense counsel thought it best to keep Macy from testifying because Macy would say that he saw two black males and one of them slipped and fell while getting into Angela's car in front of the Ledford home at the time of the crime. This would confirm Angela's testimony that defendant slipped and fell while getting into her car. Similarly, Crane gave a statement that she saw Angela's car as she stopped to get her mail, but did not see Angela. Angela testified she saw Crane and described how Crane picked up her mail. That testimony also would have corroborated the state's case. Not calling these witnesses was a matter of sound trial strategy.

■ Miller, a social worker employed by the public defender, recommended the defendant be provided a tutor so he could learn and improve himself, thereby creating mitigating evidence. Defendant had never completed an education program during his many years in prison, and there was no evidence that a tutor would have made a difference. Defense counsel reasoned evidence of defendant learning to read with the help of a tutor funded by tax dollars might have seemed trivial or silly, at best, to jurors. As further trial strategy, counsel chose not to pursue Miller's suggestion. Counsel and four other defense attorneys discussed the matter before a decision was made not to call Miller. Even Miller concurred in the decision.

Defendant claims error because a psychiatrist, Dr. Logan, did not testify at the sentencing. Dr. Logan testified at the 29.15 hearing and recalled his recommendation that defendant obtain a sleep study and neurological evaluation to show possible sleep disorders and learning disabilities. Dr. Logan testified defendant's history was indicative of a sleep disorder, not sleep apnea specifically. He testified a sleep disorder would cause inability to concentrate, especially in academic areas, and hypothesized that although defendant was not tested nor diagnosed with sleep apnea, apnea could be a relative contributing factor in causing sleep disorder. He also criticized Dr. Lipson for not having testified more extensively about defendant's asthma, physical development and the family history of poverty. He thought Dr. Lipson should have explored defendant's history of drug and alcohol abuse and the fact that defendant may have been under the influence of cocaine when the murders were committed, the possibility of genetic predisposition to crime because all ten of the Ramsey brothers had been involved with the criminal justice system, defendant's long history of imprisonment, defendant's early criminal propensities, and suggestions of child abuse by the grandfather.

Defense counsel testified that he had read Dr. Logan's report but was not impressed with it because it did not include many good things about defendant. He felt it was more of an aggravating, not mitigating, report. Another defense counsel medical source, Dr. Wisner, told defense counsel that sleep disorder studies are conducted to find the source of brain damage. But in defendant's case, there was no evidence of brain damage, so pursuing evidence of sleep disorder was putting the cart before the horse. Defense counsel discussed Logan's report with other experienced defense attorneys before deciding not to call Dr. Logan and to rely on the testimony of Dr. Lipson.

■ To prove ineffective assistance of counsel, defendant must show that he has violated both the performance and prejudice aspects of the *Strickland* test, or he fails. *Sanders v. State,* 738 S.W.2d 856, 857 (Mo. banc 1987). Strategic choices made after a thorough investigation relevant to plausible options are virtually unchallengeable. Under the performance prong of *Strickland,* the attorney only has a duty to make *reasonable* investigations of witnesses or make a *reasonable* decision that makes the investigation unnecessary. 466 U.S. at 691, 104 S.Ct. at 2066. To establish prejudice, the defendant must show there is a reasonable probability that but for counsel's unprofessional errors, the result of the proceeding would have been different. Trial counsel's conduct is presumed proper. *Id.* at 689, 104 S.Ct. at 2065. To prove counsel was ineffective for failing to call witnesses, defendant must show that the witnesses could have been located through reasonable investigation, what they would testify to if called, and that their testimony would have provided a viable defense. *Twenter,* 818 S.W.2d at 637.

■ In this case, counsel chose to use Dr. Lipson during the punishment phase. In addition, counsel chose to call defendant's mother to testify regarding the family's poverty and the defendant's background. Not using Dr. Logan avoided unfavorable areas of testimony on cross-examination by narrowing the subject matter on direct. Evidence of defendant's sleep disorder was introduced, and Dr. Logan's testimony would have been cumulative, at best. A strategic decision not to present cumulative evidence is not ineffective assistance of counsel. *Twenter.*

Finally, defendant asserts counsel was ineffective in failing to preserve all issues pertinent to voir dire and the prosecutor's closing argument. However, after scrupulous review of the record, neither the brief nor the files provide the requisite information necessary to precisely address this argument, but in reviewing such, no reversible error was found. Accordingly, counsel was not ineffective in failing to timely raise these claims.

Judgment affirmed.

COVINGTON, C.J., and BENTON, THOMAS, LIMBAUGH and ROBERTSON, JJ., concur.

PRICE, J., not sitting.