STATE of Missouri, Respondent,

v.

Mark BOYD, Appellant.

No. 73807.

Missouri Court of Appeals,
Eastern District,
Division Two.

March 9, 1999.

Motion for Rehearing and/or Transfer to Supreme Court Denied May 5, 1999.

Application to Transfer Denied June 29, 1999.

Douglas R. Hoff, Asst. Public Defender, St. Louis, for appellant.

Jeremiah W. (Jay) Nixon, Atty. Gen., Breck K. Burgess, Asst. Atty. Gen., Jefferson City, for respondent.

RICHARD B. TEITELMAN, Judge.

Mark Boyd, Defendant, appeals from the judgment entered upon a jury verdict finding him guilty of two counts of murder in the second degree and two counts of armed criminal action. We affirm.

## I. Background

On February 29, 1996, a school district employee was driving a small school bus in the City of St. Louis carrying disabled students. One of the passengers was 15–year–old Kyunia Taylor, who was six months pregnant at the time. Shortly after 7:00 a.m. the driver of the bus was sitting behind the wheel near the corner of Blair and Desoto streets, waiting for a student who was a few minutes late in arriving. A man knocked on the door of the bus. The driver opened the door and the man asked if this was the bus going to Beaumont High. The driver said yes. The man then got on the bus, pulled out a pistol, shot the driver three times and shot Kyunia Taylor six times, then fled.

Kyunia Taylor died from her wounds. Her baby, Diamond Taylor, was delivered by emergency Cesarean section, but died several weeks later from brain damage caused by oxygen deprivation directly resulting from her mother having been shot. The driver of the bus suffered serious and

permanent injuries from his gunshot wounds but survived.

Shortly after the crime two men named Michael Durley and Randy Wilkes began making a series of out-of-court statements implicating themselves and each other in this heinous crime. Though they were numerous, these statements primarily consisted of two separate and distinct groups. The first group involved several inculpatory statements that Randy Wilkes and Michael Durley allegedly made to Randy's brother, Lonzell Wilkes, on the day of the murder only hours after the shooting describing how they had done it. These statements were recounted by Lonzell Wilkes on March 6 to the police, who made an audiotape of his account. The second group of statements consisted of three confessions that Michael Durley made to the police on March 7, one of which was videotaped. In these confessions, which he recanted that same day, Durley admitted to committing the shootings and gave a detailed account of his and Wilkes' supposed involvement in the crime: He stated that he had obtained the gun he used the day before the shooting, a 9mm pistol. He described how on the day of the murder he was driving around with Robert and Randy Wilkes and they were planning on skipping school that day. They spotted the school bus and followed it for two or three blocks, until it stopped. They then parked their car in an alley, about two blocks away from the bus. Robert and Randy did not like one of the girls on the bus because they had "gotten into it" with some guys at school over the girl; they dared Michael to hurt the girl but not kill her. Michael and Randy both got out of their car and approached the bus. Michael at first tried to pry open the bus doors. He then knocked and asked the driver if the bus was going to Beaumont. When the driver said yes, Michael started to go up the stairs to get on the bus, and the driver tried to stop him. While struggling with the driver Michael pulled the gun from his waistband and shot the driver three times. He stated that he did not

aim the gun after that but just fired; he believed he shot the gun five more times, and the gun "slid back" after he finished shooting. After the shooting, he ran into the alley and drove away in the car.

There were significant inconsistencies between Durley's several confessions made to the police on March 7. For example, in his first statement he stated that he had purchased the gun the day before the shooting; in one of his later statements he said the gun belonged to Robert Wilkes and he returned it to him after the shooting. Similarly, in his first statement he indicated that only he and Randy Wilkes had approached the bus on foot; in his later statements he said that he and Randy *and* Robert Wilkes had approached the bus, and Robert had gotten on the bus with him and yelled "there's the girl!" Additionally, in at least some respects Durley's statements also seemed to contradict the version of events recalled by the eyewitness bus passengers, who, for example, said they saw only *one* man approach and get on the bus. Very shortly after his third statement Durley recanted, stating that he had lied, had not shot anyone, and had not been at the scene when the shooting took place. He was then given a polygraph examination. In the opinion of the police polygraphist who administered the test, Durley was being truthful when he denied shooting the two on the bus. Because of his prior confessions and to test his reaction, however, the polygraphist told Durley he had failed the test. Durley responded by saying he knew he would fail the test because he had, in fact, shot the girl and the bus driver. Moments later, however, he once again recanted, saying that he didn't shoot anyone and had made up the entire story. Although still considering him a possible suspect at that time, police concluded there was not sufficient evidence to hold Durley, and released him.

There was, however, some independent eyewitness evidence that Durley was seen fleeing from the scene of the crime mo-

ments after the shooting. Lamont Galliday was out walking his dogs on the day of the murders. At around 7:04 or 7:06 a.m., he was on 20th Street approaching Desoto when he passed an alley and heard shots. From where he was, he could see the school bus parked at the curb at the other end of Desoto; there were several people outside the bus and some commotion. Moments later, he saw a man run past him, then another one. The first man he saw was wearing clothing similar to what the bus passengers described the shooter as wearing. Mr. Galliday later picked Michael Durley out of a photo spread as the first man who had run past him.

On April 11, 1996, police officer David Bobo arrested a man named Malik Nettles in St. Louis County on an unrelated charge. At the time of his arrest, Nettles was in possession of a Russian Baikal 9 millimeter semi-automatic Makarov pistol. Although Nettles was released, police confiscated his weapon. Nettles was re-arrested several weeks later, however, when ballistics tests performed on the weapon proved conclusively it was the gun that had been used to kill Kyunia Taylor and Diamond Taylor and wound the bus driver.

Defendant was arrested on May 31, 1996. He was charged by indictment with one count of murder in the first degree in connection with the death of Kyunia Taylor (Count I), one count of felony murder in the second degree in connection with the death of Diamond Taylor (Count III), one count of assault in the first degree in connection with the shooting of the bus driver (Count V), and three counts of armed criminal action (Counts II, IV and VI). Prior to trial, the State filed a motion in limine to exclude Michael Durley's and Randy Wilkes' out-of-court statements implicating themselves in the crime, as well as Lamont Galliday's testimony and any other evidence specifically identifying Michael Durley. After a hearing and argument, the trial court granted the motion, ordering that any testimony that Michael Durley and Randy Wilkes may have been involved in the shooting be excluded, and further ordering that neither counsel could elicit any testimony at all about Mr. Durley.

On October 14, 1997, the cause went to trial before a jury on Counts I through IV. Sufficiency of evidence is not in dispute. Viewed in the light most favorable to the verdict, the evidence at trial showed that the murder of Kyunia Taylor was a contract killing in which Defendant paid Malik Nettles to do the shooting. Defendant lived next door to Taylor. He had had sexual intercourse with her and gotten her pregnant. Taylor's mother told Defendant she would see to it that he was held responsible for child support if blood tests conclusively proved that he was the father, and that she also possibly might have Defendant prosecuted for statutory rape. The State presented eyewitness testimony of students who were passengers on the bus identifying Malik Nettles as the shooter; presented evidence that Defendant knew Nettles and had visited with him often at Nettles' residence; presented evidence establishing that the gun found in Nettles' possession on April 11, 1996 was the gun used in the shooting; presented evidence that Defendant had purchased the gun and provided it to Nettles; presented testimony of two sisters, one of whom claimed to have witnessed Defendant pay Nettles approximately $2,000 in cash not long before the murders and the other of whom claimed to have witnessed Defendant pay Nettles roughly the same sum shortly after the murders; and presented other evidence as well pointing towards Defendant's guilt.

Defendant presented evidence at trial that he was out of state, on a trip working as a truck driver, at or near the time when the State claimed he had made his first $2,000 payment to Nettles. Defendant also testified on his own behalf at trial. He admitted to having once talked with Malik Nettles about the possibility of murdering Kyunia Taylor. Defendant insisted, however, that this had occurred only

when Nettles and some of his friends, upon overhearing Defendant talking about his troubles with Taylor, had walked over to him and made the unsolicited offer to kill Taylor for him; Defendant testified that he had responded that he did not want Taylor dead. Defendant denied ever meeting with Malik Nettles after that, or ever giving him any money or a weapon.

At the close of all evidence, instructions and argument of counsel, the jury found Defendant guilty of one count of conventional murder in the second degree, one count of felony murder in the second degree, and two counts of armed criminal action. Pursuant to the jury's recommendation, the court sentenced Defendant to serve consecutive terms of ten years for each murder count, and three years for each armed criminal action count. This appeal followed.

## II. Discussion

Defendant raises five points of error. The first alleges that the trial court erred when it granted the State's motion in limine excluding from evidence the out-of-court statements of Michael Durley and Randy Wilkes implicating themselves and each other in the shooting. The second asserts the court erred when it refused to admit into evidence handwritten notes a Mr. Robert Bobo purportedly made while traveling on a trip as an over the road truck driver, a trip during which he was allegedly accompanied by Defendant. Defendant argues these notes were admissible under the business records exception to the hearsay rule and would have corroborated his alibi that he was out of state at the time the State claimed he first paid Nettles money to kill Taylor.[1] The third claims instructional error in refusing to submit Defendant's two proposed alibi instructions. The fourth alleges error in allowing the State to play the entire video-

taped statement of Willie Nettles, Malik Nettles' brother. Defendant argues that not all of the videotape was admissible as being inconsistent with Willie Nettles' trial testimony, and that he was prejudiced by the part of the tape in which Willie Nettles stated that Defendant and Malik Nettles sometimes smoked marijuana together, since he was not charged with that offense. The fifth claims instructional error in submitting murder in the second degree instructions (and the related armed criminal action instructions) as lesser included offenses of first degree murder; Defendant contends these instructions were unsupported by any evidence in that the evidence showed that he either was guilty of a deliberate murder or else not guilty at all.

With respect to Defendant's last four points, we have reviewed the briefs of the parties and the record on appeal, and find these claims to be wholly without merit. Extended discussion of them would serve no jurisprudential purpose. Accordingly, we affirm the judgment on these points pursuant to Rule 30.25(b).

■ In his first point on appeal, Defendant argues that the exclusion of Michael Durley's and Randy Wilkes' out-of-court statements indicating that they had committed the murders, along with the corroborative testimony of Lamont Galliday identifying Durley as the first man he had seen fleeing from the scene of the crime moments after the shooting occurred, violated his due process right to a fair trial. He contends that the statements by Durley and Wilkes were declarations against their penal interest, bearing sufficient indicia of reliability to require their admission into evidence under the holding of *Chambers v. Mississippi*, 410 U.S. 284, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973), and the Missouri cases decided under *Chambers*, such

---

1. These handwritten notes, however, even had they been admitted into evidence, would merely have been cumulative to other evidence which was admitted at trial suggesting that Defendant was indeed outside the St. Louis area from February 21 until the day before the murders.

as *State v. Blankenship*, 830 S.W.2d 1 (Mo. banc 1992).

In *Chambers* the U.S. Supreme Court held that declarations against penal interest, such as extrajudicial confessions, are admissible in criminal proceedings as an exception to the hearsay rule when (a) the statements if admitted and believed would completely exonerate the defendant and (b) the statements were "originally made and subsequently offered at trial under circumstances that provided considerable assurance of their reliability." *Chambers v. Mississippi*, 93 S.Ct. at 1048. The indicia of reliability that the Court relied on in that case were (1) that each confession was "in a very real sense self-incriminatory and unquestionably against interest;" (2) that each statement had been spontaneously made to a close acquaintance shortly after the murder occurred; and (3) that the statements were corroborated by some other evidence in the case. *Id.* Additionally, courts have also noted that in *Chambers* the inculpatory statements were made on several occasions rather than merely once, and that there was independent evidence placing the declarant at the scene of the crime. *State v. Blackman*, 875 S.W.2d 122, 142 (Mo.App. E.D.1994). Defendant argues that the out-of-court statements by the two unavailable witnesses at issue in this case,[2] taken together, satisfy all of the criteria for reliability set forth in *Chambers* and therefore should not have been excluded at trial. This was prejudicial error, he claims, because (1) the State's evidence against Defendant was far from overwhelming; (2) the State's whole case was that Defendant supposedly hired Malik Nettles to do the shooting, so that if Nettles did not shoot Kyunia Taylor then Defendant could not be guilty; and thus (3), had the jury been able to hear that Michael Durley may have committed the shootings, it likely would have altered the outcome of the trial.

This claim has not been preserved for appellate review. A trial court's ruling granting a motion in limine is interlocutory only and subject to change during the course of trial; such a ruling therefore, in and of itself, preserves nothing for appeal. *State v. Purlee*, 839 S.W.2d 584, 592 (Mo. banc 1992). Rather, the proponent of the evidence must attempt to present the excluded evidence at trial, and if an objection to the proffered evidence is sustained the proponent must then make an offer of proof. *Id.* Such a requirement is strictly applied because the trial judge should be given an opportunity to reconsider his prior ruling against the backdrop of the evidence adduced at trial. *State v. Sandusky*, 761 S.W.2d 710, 713 (Mo.App. E.D.1988). Our Supreme Court has stated that this is *especially* true with respect to a defendant's attempt under the doctrine of *Chambers v. Mississippi, supra*, to introduce into evidence the declaration of another against the declarant's penal interest. *State v. Purlee*, 839 S.W.2d at 592. This is because both *Chambers* itself and the Missouri cases decided under it indicate that the question of whether such statements should be admitted "is heavily fact-dependent," so that "only with a fully developed factual context can a trial judge make a ruling that requires the balancing of a number of relevancy, reliability and other issues." *Id.*

Here, although Defendant's counsel did make the proper objections as well as a detailed offer of proof before trial at the hearing on the State's motion in limine, and also raised the issue again in his motion for new trial, he never raised the

---

2. For purposes of determining the admissibility of declaration against penal interest amounting to an extrajudicial confession, a witness is deemed "unavailable" if the witness refuses to testify pursuant to his privilege under the Fifth Amendment. *State v. Blankenship*, 830 S.W.2d at 6, n. 3; *State v. Turner*,

623 S.W.2d 4, 8, n. 4 (Mo. banc 1981). Here, the State and Defendant stipulated at the hearing on the motion in limine that Michael Durley and Randy Wilkes were both unavailable, because if called to the witness stand they would both assert their Fifth Amendment right not to testify.

matter *during* trial. It thus is not preserved for review. The question of whether to consider an unpreserved matter for possible plain error is entirely discretionary with an appellate court. *State v. Frazier*, 927 S.W.2d 378, 379 (Mo.App. W.D. 1996); *State v. Keely*, 791 S.W.2d 864, 865 (Mo.App. E.D.1990). Defendant has not requested plain error review on this issue and, in the exercise of our discretion, we decline to grant such review.

The judgment is affirmed.

JAMES R. DOWD, P.J. and LAWRENCE G. CRAHAN, J. concur.