**STATE of Missouri, Respondent,**

v.

**Johnny NORVILLE, Appellant.**

**No. 22871.**

Missouri Court of Appeals,
Southern District,
Division Two.

May 24, 2000.

Motion for Rehearing or Transfer
Denied June 15, 2000.

Application for Transfer Denied
Aug. 29, 2000.

Amy M. Bartholow, Columbia, for appellant.

Jeremiah W. (Jay) Nixon, Atty. Gen., Andrea L. Mazza, Asst. Atty. Gen., Jefferson City, for respondent.

ROBERT S. BARNEY, Judge.

Johnny Norville ("Defendant") appeals his conviction of the Class C Felony of possession of a controlled substance, § 195.202, following a jury trial.[1] Defendant was sentenced as a prior offender and

---

1. Statutory references are to RSMo 1994, unless otherwise set out.

persistent offender, § 558.016, to twelve years' imprisonment. Defendant raises eight points of trial court error discussed below. We affirm.

Viewed in a light most favorable to the verdict, we observe that on the night of February 10, 1998, Mississippi County law enforcement officers executed a search warrant at Defendant's mobile home, located just outside of East Prairie, Missouri. The officers forced open the door to the mobile home when no one responded to their knocks. Sharon Moore ("Sharon"), Defendant's fiancée and live-in, was apprehended in the hallway inside the front door and Defendant was apprehended in a bedroom. Sheriff Turley was the first law enforcement officer to enter the bedroom. He testified that Defendant was "sitting at a little counter, or something. He had his back to me." Sheriff Turley related that when he yelled for Defendant to get on the floor, Defendant whirled around wielding a lock-blade knife "and squared off with a wild look." Sheriff Turley testified that Defendant looked "[j]ust wild. Just wild-eyed looking. Just like he was in a different world." He reported that Defendant dropped the knife after a couple of seconds and was taken into custody.

On the counter in the bedroom of Defendant's mobile home, officers found two clear plastic bags containing a white substance that was later determined to be methamphetamine. One of the bags was open. The officers also seized a piece of aluminum foil, a coffee filter and a plastic cup, all later found to contain methamphetamine residue.[2] Additionally, a jar filled with a liquid red substance was found outside the mobile home near the porch.

Defendant's primary defense at trial was that he had been "framed." He contended that the methamphetamine had been planted by Sharon's son, Brice Owens ("Brice"), in collusion with Sharon's ex-husband, Jim Owens ("Jim"), Brice's fa-ther. It was Defendant's contention that both men felt a great deal of animosity toward him.

As more fully set out *infra*, Brice's statements to law enforcement officials prior to the raid on Defendant's home and his purported statements made to third parties after Defendant's and Sharon's arrests, together with his testimonies at the suppression hearing and at trial, were at times contradictory and equivocal. At the suppression hearing and at trial, Chief Deputy Keith Moore testified that Brice had been a reliable confidential informant for the Sheriff's Office in the past, and acknowledged that on February 6, 1998, Brice had informed Deputy Moore both that he had seen "a gram or two of methamphetamine in Sharon and Johnny's trailer" and that Defendant was "going to manufacture some methamphetamine" the following weekend. Deputy Moore acknowledged that he obtained a search warrant to search Defendant and Sharon's mobile home on the basis of this information. *See* Point Four.

At trial, Brice testified that "[Defendant] is totally innocent. I just want to go ahead and let everybody know that I was the one that done this." He further related that "I had a buddy of mine, I'm not gonna say no names who, but I had him to put the jar on the outside of the trailer, I left the dope at the house." He then acknowledged that by "dope" he meant methamphetamine and that he had left the drugs "in a bathroom, on the sink." Brice stated that he "cooked" some methamphetamine outside Jim's tire shop and rode over to Defendant's and Sharon's mobile home using his nephew's four-wheeler. Additionally, he set out that he told Chief Deputy Moore that he had "seen some dope out there" in Defendant's mobile home.

---

**2.** The officers further seized twelve gauge shotgun shells, a spoon, a razor blade, twenty-five milligrams of aphedrine, plastic tubing, the empty tube of an ink pen, a syringe with a needle, a set of scales, an auto-rolling device, and a bottle of "liquid fire."

On cross-examination at trial, when asked when he cooked the methamphetamine, he testified that he cooked it "[t]he day of the bust, whatever day that was."[3] The following exchange took place between Brice and the prosecutor:

Q: [Prosecutor] Did you not give [Chief Deputy Moore] information on February the 6 th, is that the day that they cooked the dope up in order for him to get a search warrant; is that the day that you called him and told him that there would be dope delivery?

A: [Brice] Yes.

Later, Brice testified as follows:

Q: [Prosecutor] And there has already been evidence in this trial, Brice, that the search warrant that he, he got a warrant for February the 6 th, 1998; do you know that?

A: [Brice] Yes.

Q: So that would have been the date that you would have given him the information to get his search warrant?

A: Yes.

Q: Could you have also cooked dope other than just once that week?

A: No, sir.

Also on cross-examination Brice reiterated that he left "a couple grams of methamphetamine ... no bigger than the end of my pinky there ... on the kitchen sink" in two bags, but did not tell Defendant he had done so.

### Point I.

In his first point, Defendant asserts that the trial court erred in overruling his motion for judgment of acquittal for possessing methamphetamine in that the State failed to prove that he had knowledge of or control over the methamphetamine.[4] This point is without merit.

"In determining the sufficiency of the evidence, all evidence and inferences rea-sonably drawn from the evidence are viewed in the light most favorable to the verdict, and contrary evidence and inferences are disregarded." *State v. Powell*, 973 S.W.2d 556, 558 (Mo.App.1998). "Review of the sufficiency of evidence is limited to determination of whether the evidence was sufficient for reasonable persons to have found the defendant guilty as charged beyond a reasonable doubt." *Id.* "Credibility of witnesses and inconsistencies in testimony are for the jury to consider." *Id.*

Defendant was charged with possession of a controlled substance. Section 195.202 provides that "it is unlawful for any person to possess or have under his control a controlled substance." To prove the elements of this offense, the State must show (1) conscious and intentional possession of a controlled substance, either actual or constructive, and (2) awareness of the presence and nature of such substance. *See State v. Purlee*, 839 S.W.2d 584, 587 (Mo. banc 1992); *State v. Yahne*, 943 S.W.2d 741, 745 (Mo.App.1997). Both possession and knowledge may be proved by circumstantial evidence. *See Purlee*, 839 S.W.2d at 587. "The State is not required to show actual, physical possession of the substance to establish possession, but may show constructive possession by circumstantial evidence." *Powell*, 973 S.W.2d at 558; *see* § 195.010(32), RSMo Cum.Supp. 1997. "A defendant who has exclusive control of property is deemed to have possession and control of any substance found on the property." *Yahne*, 943 S.W.2d at 745.

"In cases where there is joint control, a defendant is still deemed to have possession and control where there is additional evidence connecting him with the controlled substance." *Id.*; *see Powell*,

---

3. The record shows that the search warrant was obtained on February 6, 1998, a Friday, and the raid, i.e., the date of the "bust," was Tuesday, February 10, 1998.

4. Defendant filed a motion for judgment of acquittal at the close of all of the evidence.

973 S.W.2d at 559; *State v. Sours*, 946 S.W.2d 747, 752 (Mo.App.1997).

> Such additional evidence showing conscious possession of contraband by a person in joint control of the premises include [sic]: routine access to an area where controlled substances are found; the presence of large quantities of the substances at the scene where the accused is arrested; conduct and statement made by the accused, ... and a mixture of defendant's personal belongings with the substance.

*Sours*, 946 S.W.2d at 752 (quoting *State v. Buford*, 907 S.W.2d 316, 318 (Mo.App. 1995)). Here, the mobile home was unquestionably occupied solely by Defendant and Sharon. Two bags containing methamphetamine were found in the bedroom where Defendant was apprehended. Also found in the mobile home occupied by Defendant was aluminum foil, containing a white substance; a coffee filter and a cup that all tested positive for methamphetamine. Other items found in the bedroom were a razor blade, mirror, spoon, paper funnel, and a syringe. Richard Logan, a pharmacist and law enforcement official testified that it had been his experience that:

> [a]long with a razor blade, it is not uncommon for those who abuse drugs to place the drugs on the mirror, and use the razor blade to chop the drugs in to finer portions and then separate it on the mirror with the razor blade. The funnel would be used to transfer powders from one area to the other without losing any. And spoons are fairly commonly used to put the drugs in and put them before ingesting them.

The fact that Sharon used the bedroom and both parties slept in the same bedroom does not exonerate Defendant, because he had equal access to the bedroom; indeed he kept art supplies in the bedroom. "Other persons may have access to the area where drugs are found without destroying 'the incriminating fact that a defendant has access to that area.'" *Yahne*, 943 S.W.2d at 745 (quoting *State v. Steward*, 844 S.W.2d 31, 33 (Mo.App. 1992)). Additionally, Defendant admitted owning razor blades, ink pen tubes, scales, and liquid fire. The State may be able to link Defendant to the charge of possession by showing that Defendant's personal belongings were mixed with the controlled substance or otherwise showing that Defendant had "routine access to an area where the substance [was] kept...." *Steward*, 844 S.W.2d at 33. Given these facts, a reasonable jury could have concluded beyond a reasonable doubt that Defendant had an awareness of the presence and nature of the methamphetamine and that he had possession of the controlled substance. *Yahne*, 943 S.W.2d at 745–48. Point denied.

## Point II.

■ In his second point of error, Defendant claims that the trial court erred and abused its discretion in "not allowing [Defendant to] present evidence that Brice Owens had told his sister Jamie, and a friend, Dale Crump, that he framed [Defendant] by planting drugs in [Defendant's] trailer." Defendant maintains that the State had impeached Brice on cross-examination, suggesting recent fabrication, and that Defendant should have been allowed to present evidence to rebut that charge.

As previously set out, contrary to his prior declarations, at trial Brice declared that Defendant was "totally innocent" and that Brice had "cooked" and placed the methamphetamine in Defendant's mobile home and had then told Deputy Moore that it was there. On cross-examination, the prosecutor asked Brice whether Defendant's influence had "changed [his] mind," after Brice had seen Defendant in jail the night before. The prosecutor then impeached Brice with prior inconsistent statements made by him during the sup-

pression hearing.[5] After Brice's testimony was impeached by the foregoing colloquy, defense counsel attempted to elicit testimony from Dale and Jamie relative to conversations each had with Brice subsequent to arrests of Defendant and Sharon. Each attempt was met by a hearsay objection which was sustained by the trial court. However, defense counsel was permitted to make successive offers of proof of the testimonies of Jamie and Dale. First, defense counsel proffered from Dale that Brice had gone to him three or four days after Defendant's arrest and expressed remorse about what Brice had done to Defendant. Next defense counsel proffered the following testimony from Jamie:

> Q: [Prosecutor] Did you ever have occasion to talk to your brother Brice about what had happened?
>
> A: [Jamie] Yes.
>
> Q: And when was that?
>
> A: Well, he didn't never talk about it until one day, and he was drinking ... and he said, sis, you know that we set [Sharon] up.

In our review of Defendant's second point, we initially observe that "[a] trial judge has wide latitude in determining whether to admit or exclude evidence adduced by the parties at trial." *State v. McClendon*, 895 S.W.2d 249, 252 (Mo.App. 1995). "In matters involving the admission of evidence, we review for prejudice, not mere error and will reverse only if the error was so prejudicial that it deprived the defendant of a fair trial." *Id.*

"[P]rior consistent statements are admissible for the purpose of rehabilitating a witness whose credibility was attacked by express or implied claims of recent fabrication of trial testimony." *State v. Futo*, 932 S.W.2d 808, 817 (Mo. App.1996) (citing *State v. Ramsey*, 864 S.W.2d 320, 329 (Mo. banc 1993)). "Statements consistent with trial testimony given before the corrupting influence to falsify occurred are relevant to rebut a claim of contrivance." *Ramsey*, 864 S.W.2d at 329 (citing McCORMICK ON EVIDENCE, § 251, p. 119 (4th ed.1992)). "The use of the prior consistent statement should be limited, however, to the extent necessary to counter the subject on which the witness was impeached." *State v. Cole*, 867 S.W.2d 685, 686 (Mo.App.1993). "It is not only the impeachment of a witness by a prior inconsistent statement that renders admissible an earlier statement consistent with his trial testimony." *State v. Hanson*, 735 S.W.2d 100, 102 (Mo.App.1987). "Any evidence tending to permit an inference the testimony of a witness is recently fabricated opens the door to the introduction of a statement consistent with the witness's testimony if made prior to the suggested fabrication." *Id.* As a general rule, "Missouri does not restrict the use of prior consistent statements to rebut a charge of recent fabrication or improper influence or motive, but permits such statements for whatever rehabilitative value they may have." *State v. Mueller*, 872 S.W.2d 559, 563–64 (Mo.App.1994). Nevertheless, "prior consistent statements are admissible into evidence for the purpose of rehabilitation *if, and only if, the prior consistent*

---

**5.** The following colloquy took place at trial:

> Q: [Prosecutor] Did you not testify at a prior hearing, sir?
> A: [Brice] I sure did.
> Q: That you gave information because you were concerned about your mother using drugs?
> A: I was concerned.
> Q: With [Defendant]?
> A: I was concerned.
> Q: And that's why, that's why you gave information to Keith Moore; is that right?
> A: Yes, sir.

> Q: Now, you're telling us today that you don't know why you did it, it's just wrong and you did it?
> A: Well, I did want my mother to get help.
> Q: Did [Defendant] ask you to come in here today and change your story?
> A: No, sir, [Defendant] didn't ask me, [Defendant] is innocent, he's totally innocent and there is no reason for me to keep lying about it. I've been carrying this for 11 months now.
> . . . .

*rehabilitating statement was made prior to the impeaching statement." McClendon*, 895 S.W.2d at 252. By logical extension, this axiom would have application when rehabilitating a witness to rebut charges of recent fabrication.

While we determine that in pursuit of the truth in this particular instance, it would have been a wiser policy for the trial court to have allowed the testimonies of Dale and Jamie, nevertheless, we cannot say, given the particular facts of this case, that the trial court abused its discretion in not permitting the proffered rehabilitating testimonies. This is because Brice's statements made to Dale and Jamie were inherently not free of the " 'corrupting influence' to falsify." *Ramsey*, 864 S.W.2d at 329. His statements to these third parties were made *after* the arrest of Sharon and Defendant. Under the *raison d'être* justifying the presentation to the jury of consistent statements for purposes of rehabilitation after impeachment, *see Ramsey supra,* Brice could very well have had a motive to falsify his remarks at this point in time. Indeed, his remarks inculpating Defendant, made to Deputy Cook on or about February 6, 1998, and prior to the arrests of Defendant and Sharon, more closely mirror the appearance of being free of a "corrupting influence to falsify." Given the particular circumstances of this case, we cannot hold that the trial court's actions were so prejudicial as to deprive Defendant of a fair

trial.[6] *McClendon*, 895 S.W.2d at 252. Point denied.

### Point III.

In his third point, Defendant claims that the trial court erred in not permitting him to present to the jury the testimony of Jamie and Dale that Jim "told them that he framed [Defendant], with the help of Brice ... in that Jim ... testified at trial he knew nothing about a plan to frame [Defendant] and Sharon, and defense counsel was entitled to impeach his testimony with his prior inconsistent statements."[7] In support of his argument, Defendant directs us to the Supreme Court of Missouri's holding in *State v. Phillips*, 940 S.W.2d 512, 520 (Mo. banc 1997), which states that "[t]his Court ... has modified this rule in criminal proceedings to allow a party to impeach his own witness with a prior inconsistent statement without a showing of surprise and hostility."[8] In resolving this point, we need not consider the application of *Phillips, supra,* to this case. This is because Defendant failed, in either event, to lay a proper foundation for impeaching Jim.

"It is elementary that prior inconsistent statements of a witness, whether made in or out of court, are admissible for impeachment as affecting the witness' credibility." *State v. R__D__G__*, 733 S.W.2d 824, 828 (Mo.App.1987). In *State v. Bowman*, 741 S.W.2d 10 (Mo. banc 1987), one of the defendant's claims of error was that the State "failed to lay a proper foundation for

---

**6.** It should be noted that Jamie was permitted to testify that on February 10, 1998, she observed Brice making methamphetamine outside Jim's shop. According to her testimony, after Brice had finished making the methamphetamine he brought it inside the "residence" and went into the bathroom and she observed him with the methamphetamine in coffee filters and talking to Justin about how much he made. She testified that later she heard "the four-wheeler start up" at some time "between 10 and 10:30." She also stated that "the last time that Brice left on the four-wheeler, Justin went with him" and they were gone thirty or forty-five minutes. She also testified that she had seen Brice use alcohol, marijuana, methamphetamine and

pills and that she had used methamphetamine twice. She further stated that she had never seen Defendant use drugs but that she had seen Sharon use marijuana and alcohol.

**7.** Defendant was permitted to make an offer of proof of testimonies of Jamie and Dale outside the hearing of the jury.

**8.** We also observe that in *State v. Hicklin*, 969 S.W.2d 303, 309 (Mo.App.1998), the Western District of this Court flatly states that "[a] party may impeach his own witness with a prior inconsistent statement without a showing of surprise or hostility."

'impeaching' [co-defendant], by showing surprise or hostility." *Id.* at 13. The court stated:

> [t]he old rule about impeachment of one's own witness is inappropriate, in view of the statute [§ 491.074]. Inconsistent statements are available as substantive evidence, and may be used just as soon as the inconsistency appears from the testimony. *The only necessary foundation is the inquiry as to whether the witness made the statement, and whether the statement is true. Any requirement of additional foundation would dilute the effect of the statute.*

*Id.* at 13–14 (emphasis added). "To impeach a witness with extrinsic evidence of prior inconsistent statements, the witness must be given an opportunity to refresh his or her recollection and to admit, deny, or explain the statement." *State v. Boyd,* 871 S.W.2d 23, 26 (Mo.App.1993); *see also State v. Vaughn,* 501 S.W.2d 839, 842 (Mo. banc 1973).

█ In the instant matter, Defendant called Jim as his witness and asked him questions relating to Jim's relationship with Defendant and Sharon. The essence of Jim's testimony at trial was that he had no problem with either Defendant or Sharon. He *denied:* (a) telling Crump that he and Brice had framed Defendant and Sharon so that Sharon could get help for a drug problem; (b) that he had sent Dale to Wal–Mart for batteries and cold tablets; and (c) that he had any knowledge of Brice making methamphetamines in or around his shop on February 10, 1998. Save for

one instance, discussed in footnote 9 below, Jim was not expressly asked about any *inconsistent statement* that he allegedly made to either Dale or Jamie.[9] Accordingly, he was not afforded the opportunity to "refresh his ... recollection and to admit, deny, or explain the statement." *Boyd,* 871 S.W.2d at 26. Here the foundation is inadequate and the rule of fairness underlying the foundation requirement is abrogated. *Id.*; *see State v. Ivicsics,* 604 S.W.2d 773, 780 (Mo.App.1980). The trial court properly excluded extrinsic evidence of Jim's alleged prior inconsistent statements. Point denied.

## Point IV.

In his fourth point, Defendant complains that the trial court "plainly erred" in allowing the State to "present copious evidence concerning the methamphetamine manufacturing process" because such presentation violated Defendant's rights to due process in that Defendant "was charged with possessing meth, not manufacturing it, and this evidence of uncharged crimes was irrelevant to any issue at trial and was highly prejudicial." Defendant failed to object to the admission of the complained of evidence and requests plain error review.

█ Since the error of which Defendant complains was not preserved for appellate review, he bears the burden of demonstrating plain error by showing that manifest injustice or a miscarriage of justice will result if it is left uncorrected. *State v. Hornbuckle,* 769 S.W.2d 89, 92–93 (Mo.

9. Jim was asked on direct whether he recalled if he said to Jamie, "I've tried and tried to get your mom help and this is the only way I could think to do it?" In answering the question, Jim testified that "I probably would have said that, but now it might not be the way that you're taking it...." Later in the course of trial proceedings, the trial court sustained the State's motion in limine to prevent Defendant from presenting Jamie's testimony relating what Jim purportedly told Jamie. Nevertheless, Defendant was allowed to make an offer of proof of Jamie's testimony. We observe, however, that Defendant never attempted to

present Jamie's testimony to the jury, recounting Jim's alleged prior inconsistent statement, to-wit: "I tried to get your mother help and I didn't know what else to do besides this...." Accordingly, Defendant waived the review of any possible error arising from the exclusion of this portion of Jamie's proposed testimony. *See State v. Buchanan,* 824 S.W.2d 476, 478 (Mo.App. 1992)("a ruling on evidence will only be preserved when it is made at trial at the time the evidence is offered"); *State v. Brittain,* 895 S.W.2d 295, 298 (Mo.App.1995).

banc 1989), *cert. denied,* 493 U.S. 860, 110 S.Ct. 171, 107 L.Ed.2d 128 (1989). He must go beyond the mere showing of demonstrable prejudice to show manifest prejudice affecting his substantial rights. *Id; State v. Henderson,* 954 S.W.2d 581, 583–84 (Mo.App.1997) (quoting *State v. Fleischer,* 873 S.W.2d 310, 314 (Mo.App. 1994)).[10]

 The State presented evidence that a glass jar with a red top and a tube sticking out of it was found outside Defendant's trailer. As noted before, Brice testified that he had Justin leave the jar outside the trailer while he was inside planting the packets of methamphetamine. When asked what was in the jar, Justin answered "it's supposed to be ether and pills." Further, Chief Deputy Moore testified as to the jar, "[i]t looked, as far as me and my experience as an officer and what I have done with the clandestine lab and stuff, it appeared to me to be some kind of pill soaking, Sudafed or something like that."

Additionally, the prosecutor had each of the law enforcement witnesses describe his background and training relating to methamphetamine, including its manufacture. Sheriff Turley was also asked about the process of cleaning up methamphetamine laboratories, including who generally performs the clean-up and the cost to the county if the county has to "pay to destroy a small lab." Defendant claims that admission of such evidence was plain error on the part of the trial court. We disagree.

In *Yahne,* 943 S.W.2d at 745, the defendant claimed the trial court erred in admitting evidence of a large amount of cash and drug related materials that were found on his property in that he was charged only with possession of a controlled substance. He argued that the complained of evidence concerned the separate crimes of possession of drug para-

phernalia and manufacturing a controlled substance. The appellate court held that the complained of evidence was admissible in that it related "to [the defendant's] awareness of the presence and nature of the controlled substance found in his possession." *Id.* at 746. The same rationale applies to the instant matter. The officers are permitted to testify as to their backgrounds and experiences relating to the manufacture of methamphetamine. Such evidence is allowable because it is relevant in proving Defendant's "awareness of the presence and nature of the controlled substance...." *Id.* at 746. Further, the evidence relating to the clean-up cost for methamphetamine chemicals was also admissible to explain why the substance in the glass container found outside Defendant's residence was not analyzed. Such explanation was particularly important in this case considering there were accusations of police involvement in framing Defendant for the crime. The trial court did not commit plain error by allowing such evidence to be presented in that its admission caused no manifest injustice or miscarriage of justice. *Id.* Defendant's fourth point is denied.

*Point V.*

 In his fifth point, Defendant complains that the trial court plainly erred in overruling Defendant's motion to suppress the evidence found in connection with the search of his mobile home, and for admitting the evidence at trial because the "affidavit for search warrant contained false statements, which were knowingly and intentionally included in the affidavit, and without these false statements, the affidavit was insufficient to establish probable cause to issue the warrant...."

We observe that Defendant's motion to suppress claimed only that the evidence should be suppressed because "[t]he search was unlawful in that it was conducted, without probable cause" since "[t]he

---

**10.** The immediately foregoing precepts are equally applicable to Defendant's fifth through eighth points as he seeks plain error review in all of them.

warrant failed to state adequate facts to establish probable cause...." On appeal, Defendant now attempts to raise a claim of error under *Franks v. Delaware*, 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978), by asserting that the affidavit "contained false statements, which were knowingly and intentionally included in the affidavit...." Again, Defendant failed to object to the admission of the complained of evidence at trial and asks for plain error review on appeal.

In *Franks*, the United States Supreme Court held that:

[W]here the defendant makes a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit, and if the allegedly false statement is necessary to the finding of probable cause, the Fourth Amendment requires that a hearing be held at the defendant's request. In the event that at that hearing the allegation of perjury or reckless disregard is established by the defendant by the preponderance of the evidence, and, with the affidavit's false material set to one side, the affidavit's remaining content is insufficient to establish probable cause, the search warrant must be voided and the fruits of the search excluded to the same extent as if probable cause was lacking on the face of the affidavit.

*Id.* at 2676.

The affidavit of which Defendant complains contained the following averments, *inter alia:*

3. On 01–24–98 I met with CI # 10, who stated they [sic] smelled a strong odor of ether coming from the residence of [Defendant] and [Sharon's] trailer; CI # 10 stated they [sic] observed several vehicles come to the trailer, parking at the east end of the trailer.[11] CI # 10 recognized one of [sic] vehicles as being the truck belonging to Ricky Huff, who has a history of being involved with illegal drugs. The truck is [a] Ford pick-up, maroon in color, with a step side bed.

According to CI # 10 when a car would pull up and park at the east end of the trailer, [Defendant] would come outside, then go back in the trailer and CI # 10 could see [Defendant] go to the west of the trailer, then come back out of the residence and hand something to the person waiting in the vehicle, and after the exchange, the vehicle would leave. CI # 10 witnessed this occur many times.

The smell/odor of ether was very strong when [Defendant] would open the front door; also, CI # 10 detected the odor of ammonia or anhydrous.

4. On 01–28–98 I met with CI # 14 who stated that they talked to [Defendant] and [Sharon]. [Defendant] and Sharon told CI # 14 that they were going to cook a batch of dope (Meth) this weekend.

5. On 01–01–98 Sgt. Branden Caid went to the residence, at which time he detected an odor which smelled like ether.

6. 02–06–98 I met with CI # 12. CI # 12 told me that he had been in [Defendant's] residence on this date, and had seen Methamphetamine in the house. CI # 12 estimated that it was probably 2–3 grams. Also, [Defendant] stated to CI # 12 that he was going to try to cook another batch this weekend.

During the suppression hearing Deputy Cook denied making some of the statements attributed to him in the affidavit. At the suppression hearing the following exchange took place:

---

11. CI stands for "confidential informant." During the suppression hearing it was revealed that confidential informant number 10 was Deputy Ronnie Cook and confidential informant number 12 was Brice. Confidential informant number 14 was never identified.

Q: [Defense Counsel] Okay. That night you were out there, did you ever tell Keith Moore that you saw [Defendant] hand anything to anybody that night?

A: [Deputy Cook] No, ma'am.

Q: Did you ever tell Keith Moore that you ever saw [Defendant] hand anything to anybody?

A: No.

Q: Outside of the smell of ether, did you ever tell Keith Moore that you smelled any other types of chemical smells?

A: No, ma'am, just that I you [sic] smelled ether.

Q: You never told them that you smelled anhydrous ammonia?

A: No, ma'am, not that I recall. I still say it was ether.

Deputy Cook also stated that "Ricky Huff's" vehicle "stopped in front of the trailer and went out, [Defendant] didn't come out to talk to him" and that he couldn't tell any difference in the strength of the odor when Defendant's door was open and closed.

Brice's testimony at the suppression hearing was equivocal. As to his involvement with Deputy Keith Moore, he stated:

Well, they said that whenever they come over there to Kentucky they said that I was supposed to tell him that I seen two or three grams of dope in the house. Like I said, I don't recall saying that. I mean, I'm not saying that I didn't say it or I did say it.... [12]

Later, the following colloquy occurred:

Q: [Prosecutor] So what you're saying here today is that you didn't say anything to Mr. Moore about any drugs being at [Defendant's] residence on February 6th, 1998?

A: [Brice] I don't recall saying anything about any drugs being there. Like I say, I may have, but I don't recall.

Brice then recounted that he could not recall saying anything about drugs being located on Defendant's property:

Q: [Prosecutor] What did you tell Keith Moore prior to the bust at [Sharon's] and [Defendant's] house regarding what was going on out there?

A: [Brice] I don't never remember telling Keith at all that I seen any dope out there. On February 6th, I know I didn't say that. I'm pretty sure, but before I may have said that like before when he stopped by the shop and talked to dad. I don't know, he knew that we was using it and he knew that they was cooking it.

When asked "[i]s there any reason about why you told Keith what was going on at the house? Any personal reasons you had?" Brice answered "Well, for one, I thought mom was looking pretty bad. I mean, I wanted her to get help, but I did it myself, I guess, but I just wanted her to get help, get out of it." Brice, however, never denied making the statement contained in the affidavit for the search warrant. The best that can be stated is that he didn't recall making statements attributed to him.

Although Defendant's motion to suppress failed to state a claim under *Franks*, and Defendant failed to object to the admission of the complained of evidence at trial, we gratuitously note that even without the portions of Deputy Cook's statement that were allegedly fabricated, we are still left with the statements of Deputy Cook that he smelled ether at Defendant's residence; that he observed unusually heavy vehicle traffic at the mobile home; and that he saw Ricky Huff drive up, stop, and drive on. Additionally, the affidavit of Chief Deputy Moore reflects that confidential informant #14 relayed to Deputy Moore that Defendant and Sharon told him that "they were going to cook a batch of dope (Meth) this weekend." Lastly, Deputy Caid also related that he smelled

---

**12.** It appears from the record that Deputy Moore with, evidently, at least one other person, made a visit to Brice while he was incarcerated on a separate charge in Kentucky.

ether around Defendant's mobile home. Despite Brice's equivocal testimony, during the suppression hearing, Chief Deputy Moore testified that the information contained in his affidavit for search warrant, as related to him by Brice, was correct. "The affidavit in support of a search warrant should be weighed as understood by those versed in law enforcement and not in terms of library analysis by scholars." *State v. Hill*, 854 S.W.2d 814, 818 (Mo.App. 1993). "[A] grudging or negative attitude toward warrants by reviewing courts is inconsistent with the Fourth Amendment's preference for searches by warrant; and courts should not invalidate warrants by interpreting affidavits in a hypertechnical rather than common sense manner." *Id.* Considering only the remaining, unchallenged statements contained in the affidavit we are, nevertheless, led to conclude that the affidavit still provided sufficient probable cause for a search warrant. We find no manifest injustice or miscarriage of justice by the trial court's refusal to suppress the evidence found in connection with the search warrant and its subsequent introduction at trial. Point denied.

*Point VI.*

In his sixth point, Defendant complains that the trial court erred "in not letting [Defendant] use a memo written by the prosecutor to impeach the testimony of law enforcement officers, and the trial court plainly erred and abused its discretion by not *sua sponte* requiring the prosecutor to correct the false testimony given by law enforcement officers at trial" in that "the officers testified that they knew nothing about a four-wheeler, but the prosecutor and the trial court knew that the prosecutor's memo stated that 'we were unable to catch the person on the four-wheeler who took off from the trailer as the officers approached.' " [13]

Prior to trial, the trial court considered a motion in limine filed by the State in which the State sought an order "precluding the [Defendant] from attempting to inject improper and inadmissible evidence regarding plea negotiations. . . ." The following colloquy took place relating to the memo from the prosecutor to defense counsel.

> Defense Counsel: What I intend to make mention of, Your Honor, is the fact that there was stated in there that there was a person that [left] on a four-wheeler that the officers were unable to apprehend. And, the officers, or the, the sheriff's deputies have all of a sudden turned a deaf ear. They've all forgotten about the four wheeler that left, and what I intend to use of that, Your Honor, is to refresh their recollection as to this fact.

> The Court: Well, this was made by State's counsel. I assume that was a memo from you, [Prosecutor]?

> Prosecutor: Yes, it is.

> The Court: [The Prosecutor], I assume, is not going to take the witness stand here today, so I will sustain the Motion to [sic] Limine relative to the document. Any other Motions in Limine?

At trial, Defendant asked Sheriff Turley and Chief Deputy Moore about seeing a four-wheeler leave Defendant's mobile home immediately before they executed

**13.** The memo in question reads, in pertinent part, as follows:

> Regarding [Defendant] and [Sharon], it is my understanding that they want to blame [Sharon's] son, Brice, for the jar of methamphetamine mixture found outside the front door of the trailer. Unfortunately, we were unable to catch the person on the four wheeler who took off from the trailer as the officers approached. However, ask [Defendant] what he was doing when the sheriff entered the trailer. I believe we have a syringe that [Defendant] had in the bedroom filled with a little methamphetamine. I have also sent you a copy of the rest of the inventory we found in the house. I believe that the defendant's [sic] will be hard pressed to argue that they were not involved in the production or distribution of mehtaphetamine [sic]. I have reduced their offers to 5 years prior to preliminary hearing. They may hold that offer by waiving the preliminary hearing.

> Please let me know if they want an [sic] preliminary on March 30, 1998.

the search warrant. Chief Deputy Moore testified that he didn't hear a four-wheeler leave immediately at that time and Sheriff Turley testified in a similar vein. At trial, Defendant made no attempt to introduce the memo of the Prosecutor into evidence.

Defendant claims on appeal that the trial court erred in sustaining the State's motion in limine, and that the trial court should have *sua sponte* required the prosecutor to correct false testimony given by law enforcement officers at trial. "A trial court's ruling granting a motion in limine is interlocutory only and subject to change during the course of trial; such a ruling therefore, in and of itself, preserves nothing for appeal." *State v. Boyd*, 992 S.W.2d 213, 218 (Mo.App.1999). "Rather, the proponent of the evidence must attempt to present the excluded evidence at trial, and if an objection to the proffered evidence is sustained the proponent must then make an offer of proof." *Id.* "Such a requirement is strictly applied because the trial judge should be given an opportunity to reconsider his prior ruling against the backdrop of the evidence adduced at trial." *Id.* In our gratuitous review, we determine that it is impossible to discern if the prosecutor's comment stems from information he obtained from officers who were at the scene or if he was merely responding to an allegation made by defense counsel. Additionally, even if some law enforcement officer did hear a four-wheeler leave the scene and told the prosecutor, there is no evidence that the officers that testified at trial heard anything. We find no manifest injustice or miscarriage of justice suffered by the Defendant due to the trial court's action. Defendant's sixth point is denied.

### Point VII.

■ In his seventh point, Defendant complains that certain statements in the State's closing argument were improper in that they "invited the inference that by exercising his constitutional rights, [Defen-

dant] was therefore being untruthful." The complained of statements of the prosecutor are, as follows:

> How believeable [sic] is it from [Defendant], ladies and gentlemen? He seemed to come up with every answer possible as to all the evidence. How can he do that? Because he's had all this time to make up his story as to every fact and every evidence the State has.

Defendant failed to object to the prosecutor's comments at trial and again seeks review for plain error.

In our gratuitous review, we observe that Defendant testified in his own defense at trial. "If a defendant testifies on his own behalf, his testimony is subject to argument on credibility." *State v. Jacobs*, 939 S.W.2d 7, 11 (Mo.App.1997). "The Prosecutor may . . . comment on the credibility of the defendant as a witness and assert the improbability and untruthfulness of his testimony." *State v. Burnett*, 931 S.W.2d 871, 875 (Mo.App.1996). "Statements made in closing argument rarely constitute plain error requiring reversal." *Jacobs*, 939 S.W.2d at 11. "Substantial latitude is allowed during closing argument, and under plain error review, improper argument does not justify reversal unless the defendant has demonstrated that the remark had a decisive effect on the jury's verdict." *Id.*

Defendant relies heavily on *Agard v. Portuondo*, 117 F.3d 696, 707–15 (2nd Cir. 1997), which held that a prosecutor's comments during closing argument indicating that, due to the defendant's presence in the courtroom, defendant had opportunity to tailor his testimony to match the evidence, violated the defendant's right to confrontation, right to testify, and right to receive due process and fair trial.[14] We note, however, that the United States Supreme Court in *Portuondo v. Agard*, 529 U.S. 61, 120 S.Ct. 1119, 146 L.Ed.2d 47 (2000), recently held that a prosecutor's comments that an accused had opportunity

---

**14.** The prosecutor commented during closing argument:

> You know, ladies and gentlemen, unlike all the other witnesses . . . the defendant has a benefit and the benefit that he has, unlike

to hear all other witnesses before testifying and to tailor his testimony accordingly, did not violate the accused's rights under Federal Constitution's Fifth, Sixth, or Fourteenth Amendments. No manifest injustice or miscarriage of justice flowed from the prosecutor's comments in question. Point denied.

### Point VIII.

■ In his eighth and final point on appeal, Defendant claims the trial court plainly erred in "letting the State introduce evidence that on the night of his arrest, [Defendant] had long hair, tarnished looking clothing, and a very scraggly appearance" in that Defendant's appearance at the time of his arrest "was irrelevant to any issue at trial and was more prejudicial than probative."

At trial, both Sheriff Turley and Deputy Moore testified as to Defendant's slovenly appearance on the night of his arrest, as contrasted with his much improved appearance at trial. Defendant failed to object to the admission of the complained of evidence and requests plain error review. " '[U]nless a claim of plain error facially establishes substantial grounds for believing that 'manifest injustice or miscarriage of justice has resulted,' this court will decline to exercise its discretion to review for plain error under Rule 30.20.' " *State v. Brown*, 996 S.W.2d 719, 726 (Mo.App.1999) (quoting *State v. Brown*, 902 S.W.2d 278, 284 (Mo. banc 1995)). In this instance we decline to review for plain error. Point denied.

The judgment is affirmed.

MONTGOMERY, P.J., PREWITT, J., concur.

all the other witnesses, is he gets to sit here and listen to the testimony of all the other witnesses before he testifies.... That gives you a big advantage, doesn't it? You get to sit here and think what am I going to say and how am I going to say it? How am I going to fit it into the evidence.... He's a smart man. I never said he was stupid.... He used everything to his advantage. *Id.* at 707.