**STATE of Missouri, Respondent,**

v.

**Lucas CAMPBELL, Appellant.**

No. 27919.

Missouri Court of Appeals,
Southern District.

April 22, 2008.

Nancy A. McKerrow, Columbia, for Appellant.

Jeremiah W. (Jay) Nixon, Atty. Gen., Joshua N. Corman, Office of the Atty. Gen., Jefferson City, for Respondent.

DANIEL E. SCOTT, Judge.

Defendant Lucas Campbell appeals his first-degree murder conviction. He does not challenge the sufficiency of the evidence, which we summarize in the light most favorable to the verdict. *State v. Woodmansee*, 203 S.W.3d 287, 289 (Mo. App.2006).

### Facts and Procedural Background

Defendant, Nick Gamblin, and their girlfriends lived together. Gamblin, who was on probation, was selling drugs as a middleman for Defendant. People regularly came to their house to use drugs, usually marijuana. Bobby Wilson ("Victim") came one day with a lot of marijuana. After smoking awhile, Gamblin, Defendant and his girlfriend, and Victim borrowed a car to drive around and smoke some more.

Victim wanted to sell some of his marijuana. Defendant directed Gamblin, who was driving, to Sarena Hart's rural home. Defendant took Victim's marijuana, and along with Gamblin, went inside. Victim and Defendant's girlfriend stayed in the car.

Instead of mentioning the marijuana to Hart, his former girlfriend, Defendant asked if she would stay his friend if he had done something really bad. Hart jokingly asked Defendant who he had killed. Defendant replied no one "yet." Defendant asked Hart to leave for a little while.

When she refused, he asked if he could hide a body on her property. He told Hart not to go outside when they left. She did so anyway, waved at the other two in the car, and Victim smiled and waved back.

The group left, drove around, and smoked more. Gamblin was driving down a farm road when Defendant said to pull over so he could urinate. All three men got out. Gamblin finished first and returned to the driver's seat. He heard a gunshot and saw Victim lying near the ditch. Defendant returned to the car, holding a .40 caliber gun Gamblin had seen him carry before. Defendant said he was sorry to do that in front of them, but he thought Victim was a "snitch." Defendant took over the driver's seat, warning Gamblin to keep his mouth shut or he would be killed. Defendant drove to an acquaintance's trailer, left the gun there, and drove home after stopping for something to eat.

Gamblin was scared and shaking when they returned. He called Richard Stacey, a friend who sold drugs and had known Defendant for years. Without going into details, Gamblin told Stacey that Defendant had done something bad and Stacey needed to talk to him. Stacey found Defendant, who (in two conversations with Stacey) said he "popped" Victim in the back of the head, "blew half his face off[,]" and dropped the gun off afterwards because he thought Victim was a police informant.

Ironically, Stacey was a police informant. He relayed Defendant's statements to law enforcement, which linked that information to Victim's death and the crime scene. Police eventually found the car, which Gamblin had hidden, and arrested Gamblin on a probation violation warrant. They recovered Defendant's gun, still hold-

ing eight live .40 caliber hollow-point rounds.[1] They forensically established that the same gun fired a spent casing found at the crime scene. Police searched Defendant's bedroom after his arrest and found a holster fitting a .40 caliber handgun, and a cash box holding ammunition, including one .40 caliber cartridge matching the live rounds still in the murder weapon. There was trial testimony that Defendant always carried a .38 or .40 caliber handgun. The autopsy showed Victim was shot in the back of the head with a bullet of similar caliber that cut his brain stem in half.

Defendant did not testify at trial. The jury found him guilty of first-degree murder, and he was sentenced to life without parole. His two appeal points challenge evidence admitted against him.

### Point I—Gamblin's Video Statement

■ Gamblin was a key prosecution witness. The defense focused on his plea bargain to discredit his testimony. In opening statement, for example, defense counsel told the jurors that Gamblin made a deal to protect himself from prosecution; Gamblin would accrue benefits from testifying; and that:

> You will hear how Nick Gamblin is going to walk out of this courtroom a free man because of a plea agreement he had made with the State. Even from his own testimony that you will hear, he is in the car, sees a murder, hides essential evidence, does not notify law enforcement before they find him, and faces only one Class D felony of tampering with evidence. That's it. And as long as his testimony satisfies the State, he walks out of here a free man. Not even on probation. He will be done with the judicial system with no one watch-

ing. Nick Gamblin from his own admissions, you will hear, is involved up to his eyeballs in this crime but, from his testimony, will be free.

Defense counsel also insinuated that Gamblin was framing defendant, and that his testimony was influenced by his plea deal.

To rebut these "fabrication" claims, and over Defendant's objection, the state was allowed to play Gamblin's videotaped statement to police on the day of his arrest. Defendant claims this was improper bolstering since the video largely duplicated and corroborated Gamblin's in-court testimony.

■ Prior consistent statements are admissible to rehabilitate a witness whose credibility has been attacked by an express or implied claim of fabricated trial testimony. *State v. Ramsey*, 864 S.W.2d 320, 329 (Mo. banc.1993). "Statements consistent with trial testimony given before the corrupting influence to falsify occurred are relevant to rebut a claim of contrivance." *Id., citing* McCORMICK ON EVIDENCE, § 251, at 119 (4th ed.1992); *State v. Garris*, 75 S.W.3d 367, 369 (Mo.App.2002); *State v. Norville*, 23 S.W.3d 673, 678 (Mo.App. 2000).

■ In contrast, improper bolstering occurs when an out-of-court statement is offered *solely* to duplicate or corroborate trial testimony. If the statement is offered for a relevant purpose such as rehabilitation, it is not improper bolstering. *State v. Christeson*, 50 S.W.3d 251, 267 (Mo. banc 2001); *State v. Wolfe*, 13 S.W.3d 248, 257 (Mo. banc 2000), *Ramsey*, 864 S.W.2d at 329. The suggestion that a witness's testimony is recently fabricated opens the door to introduction of the witness's consistent statement made prior to the suggested fabrication. *Norville*, 23

---

1. The gun had a ten-round capacity.

S.W.3d at 678; *State v. Ray*, 852 S.W.2d 165, 168 (Mo.App.1993).

Gamblin's video statement predated his plea bargain, and presumably any plea bargain discussions as well. However, Defendant claims Gamblin's motive to lie predated his arrest, and thus argues that the video was made *after* the "corrupting influence." This is not the first case where parties have disputed the relevant date for these purposes. *See Garris*, 75 S.W.3d at 369. *See also Norville*, 23 S.W.3d at 678–79. We initially note, as we did in *Norville*, 23 S.W.3d at 678, the trial court's broad discretion in determining whether to admit or exclude trial evidence; that we review for prejudice, not mere error; and that we will reverse only for error so prejudicial that it deprived the defendant of a fair trial.

Since the defense repeatedly cited Gamblin's plea bargain to discredit his testimony, the trial court did not abuse its discretion in permitting the state to show that Gamblin told the same story before his plea deal or any such negotiations. Nothing precluded Defendant from a jury argument that Gamblin was motivated to lie before he was arrested, and to discount his statement accordingly. Considering defense counsel's focus on the plea deal, however, such an argument more properly goes to the statement's weight, not its admissibility. We deny Point I.

### Point II—Holster and Cash Box/Ammunition

■ Defendant also challenges the admission of the cash box, ammunition, and holster found in Defendant's bedroom.[2] There was uncontroverted testimony that the holster was a good fit for the killing

weapon, and thus no abuse of discretion in admitting it.

■ Defendant has not contested the relevance of the cash box and .40 caliber shell therein. He argues the prejudice of the other ammunition—which he admits is not illegal to possess—so outweighs these exhibits' relevance that it was error to admit them. Rather than denying the point for failure to file the relevant exhibits for our review, we carefully combed the transcript again and are satisfied that admitting this evidence was no abuse of discretion. Nor has Defendant shown any prejudice—*i.e.*, that " 'when considered with and balanced against all of the evidence properly admitted, there is a reasonable probability that the jury would have reached a different conclusion....' " *State v. Manley*, 223 S.W.3d 887, 892 (Mo.App. 2007), *quoting State v. Roberts*, 948 S.W.2d 577, 592 (Mo. banc 1997). We find nothing in the record that diverted the jury's attention from the issues to be resolved. *State v. Mills*, 809 S.W.2d 1, 5 (Mo.App. 1990). We deny Point II and affirm the judgment.

PARRISH, P.J., and BATES, J., concur.

---

2. Photographs of each item were admitted along with the items themselves. Point II, like Defendant's trial objections, covers both the items and the photos and makes the same arguments as to each. For simplicity, therefore, we will refer only to the items.